

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-23-2004

# Singh-Kaur v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-1766

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Singh-Kaur v. Atty Gen USA" (2004). *2004 Decisions.* Paper 268.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/268

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES
COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 03-1766

———

CHARANGEET SINGH-KAUR,
Petitioner

v.

JOHN ASHCROFT,
ATTORNEY GENERAL
UNITED STATES OF AMERICA,
Respondent

———

On Petition for Review
of an Order of the
Board of Immigration Appeals
(INS No. A29-932-930)

———

Argued: March 30, 2004

Before: Alito, Fisher and Aldisert,
Circuit Judges,

(Filed: September 23, 2004)

Steven A. Morley (ARGUED)
Morley Surin & Griffin, P.C.
Constitution Place
325 Chestnut Street, Ste. 1305-P
Philadelphia, PA 19106

ATTORNEY FOR PETITIONER

Robert D. McCallum, Jr.
Assistant Attorney General
Michael P. Lindemann
Assistant Director
Ethan B. Kanter (ARGUED)
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, D.C.  20044

ATTORNEYS FOR RESPONDENT

———

OPINION OF THE COURT

———

ALDISERT, Circuit Judge.

Charangeet Singh-Kaur,[1] a native and citizen of India, petitions this Court to review an order of the Board of Immigration Appeals ("BIA") that Singh be deported from the United States to India.  This appeal requires us to determine whether providing food and setting up shelter for people engaged in terrorist activities constitutes affording "material support" within the meaning of the Immigration and Nationality Act ("INA") § 212(a)(3)(B)(iv)(VI) (2002), 8 U.S.C. § 1182(a)(3)(B)(iv)(VI) (2000 & 2002 Supp.).  For the reasons that follow,

———

[1] At oral argument, the petitioner's attorney informed us that the petitioner's proper surname is "Singh," and we will refer to the petitioner by that name.

we conclude that it does, and we will deny the petition for review.

The BIA had jurisdiction to review the decision of the Immigration Judge ("IJ") pursuant to 8 C.F.R. § 3.1(b) (2002) (renumbered 8 C.F.R. § 1003.1(b) (2003)). Because Singh was placed in deportation proceedings before April 1, 1997, and his final order of deportation was issued by the BIA after October 31, 1996, we have jurisdiction under 8 U.S.C. § 1105(a) (1994), as amended by the transitional rules for judicial review in section 309(c)(4) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-626 (Sept. 30, 1996) ("IIRIRA"). See also Sandoval v. Reno, 166 F.3d 225, 229 (3d Cir. 1999) (applying IIRIRA transitional rules of jurisdiction).

I.

Singh entered the United States without inspection on September 27, 1989. The Immigration and Naturalization Service ("INS")[2] initiated deportation proceedings. Singh submitted an

---

[2] The immigration enforcement functions of the former INS were transferred to the Bureau of Citizenship and Immigration Services within the Department of Homeland Security. See Homeland Security Act of 2002, Pub. L. No. 107-296, § 451, 116 Stat. 2135, 2195 (2002) (codified at 6 U.S.C. § 271 (Supp. 2003)). Because the operative events in this case took place before the name change, INS is used here.

application for asylum, asserting that if he returned to India he would be arrested and persecuted. He claimed membership in the "Babbar Khalsa Group," whose purpose, he said, was "to protect and promote the Sikh faith," and the "Sant Jarnail Sing Bhindrawala Militant Group," whose purpose was "to fight for and protect the religious and political cause of Sikh community." Singh stated that he had participated in demonstrations and other activities of these two groups. He further claimed to be "on the military and police wanted list because of known and suspected activities against the government" of India.

In an affidavit supporting his asylum application, Singh stated that after the Indian military attacked a Sikh holy site called the Golden Temple in 1984, he "together with many other young men in our village formally took the vows to join and follow the militant section of Sant Jarnail, known as Babbar Khalsa." He said that he participated in "planning meetings" and "became involved in assisting the freedom fighters in the movement of weapons through my village and other villages, as well as giving shelter to militants who were involved in the transportation of weapons." Subsumed in all of this is a statement of military activity against the government of India.

Singh submitted additional materials supporting his application for asylum, including evidence of active membership in the International Sikh Youth Federation and a statement by the

Khalistan Commando Force that Singh had taken an oath to participate with the Force.

A previous immigration judge in this case referred Singh's application for asylum to the Department of State for its non-mandatory review and comments. See 8 C.F.R. § 208.11 (1991). In a letter dated January 9, 1992, the State Department's Bureau of Human Rights and Humanitarian Affairs concluded that the Indian government did not persecute Sikhs such as Singh merely for their faith or membership in certain organizations. Rather, Sikhs targeted for arrest were those who had involvement in specific violent acts.

The State Department further commented:

> The applicant, however, admits to membership in the International Sikh Youth Federation, a radical off-shoot of the AISSF, as well as the Khalistan Commando Force, a notorious terrorist group responsible for a grisly April 1985 random killing in a Punjab village, and the equally notorious Babbar Khalsa, an even more fundamentalist terrorist group with a reputation for its use of explosives. Many of the bombings resulting in the murder of innocent persons in recent years are attributed to the latter group.

Following the entry of the State Department letter, the administrative record reflects an unexplained gap of nearly four years in the proceedings. On October 23, 1995, the INS moved to re-calendar the case for completion of deportation proceedings. Subsequently, Singh informed an immigration judge that he was the beneficiary of an approved skilled worker visa petition enabling him to proceed on an application for adjustment of status.[3] He stated that the adjustment of status request would be his principal application.

Singh then submitted an affidavit purporting to clarify statements in his asylum application. He asserted that he had never been involved in or supported violent activities against Indian government officials. He stated that the Indian police and military merely presumed that he, as a Sikh, opposed the government. He said that he had undergone an induction ceremony known as "Amrit Chakna," in which he committed to remain faithful to his religion, to wear a turban and to keep his hair and beard long. He stated that he was enrolled as a member of Babbar Khalsa at the time of this ceremony.

---

[3] At a hearing on September 17, 1996, the IJ noted that "it is unfortunate to observe that from 1990 until the present time, 1996, nothing has been done in regard to the respondent's deportation case." (A.R. at 80.)

3

He further stated that, having participated in Amrit Chakna, he was expected to make charitable contributions to the community, including "provision of food and assistance to the poor." While acknowledging that some members of Babbar Khalsa had been involved in violence in the 1990s, he stated that he had been in the United States since 1989 and did not support militant activities. He did state, however, that while he was in India there were several killings of Indian police by Muslims in Sikh clothing.

At a hearing on January 22, 1997, Singh told the IJ that he assisted with meetings of Sant Jarnail Singh followers:

> "We – I used to help by putting that tent and organize the mondo [sic] or the tent. . . . I never kept any weapons. Those Sikhs who were baptized, they used to come and they knew that I am also baptized and I just help them with the – giving them food."

On February 18, 1998, the IJ concluded that Singh was eligible for adjustment of status and granted his application. The IJ determined that even though Singh had entered the United States without inspection, his eight-year presence gave him "sufficient equity to overcome that adverse Immigration conduct." The INS appealed, and on February 26, 2003, the BIA vacated the IJ's order and ordered Singh removed from the United States. The BIA determined that Singh was ineligible for adjustment of status pursuant to 8 U.S.C. §§ 1255(a) and 1182(a)(3)(B)[4]:

> We note that the respondent testified that he was a member of the Babbar Khalsa and the Sant Jarnail Singh Bhindra Wala. *See* Tr. at 64. He further testified that he had helped members of these groups, who were fighting the Indian government, by giving them food and helping to set up tents for them. *See* Tr. at 65. A person "engages in terrorist activities" by providing "*any type* of material support" to "any individual the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity." *See* section 212(a)(3)(B)(iii) of the Act (emphasis added).

---

[4] The BIA quoted portions of the INA as it read prior to enactment of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism ("USA PATRIOT") Act of 2001, Pub. L. No. 107-56, § 411(a)(1), 115 Stat. 272, 346-347 (2001). Compare INA § 212(a)(3)(B)(iii) (2000), 8 U.S.C. § 1182(a)(3)(B)(iii) (2000) with INA § 212(a)(3)(B)(iv) (2002), 8 U.S.C. § 1182(a)(3)(B)(iv) (2000 & 2002 Supp.).

We find that the described actions, of offering food and helping to arrange shelter for persons, constitute "material support," as contemplated by section 212(a)(3)(B)(iii) of the Act. The respondent further admitted that he had offered the described support to "militants who were engaged in terrorist activities." *See* Tr. at 65. As these militants were members of groups which were designated as terrorist organizations, by the United States Department of State, and on account of the respondent's admission that he was aware of their terrorist activities, we find that the respondent did in fact offer persons, who had committed and were planning to commit terrorist activities, material support.

(A.R. at 3) (footnote omitted).

Singh timely petitioned for review.

## II.

We review the BIA's factual findings to determine whether they are supported by substantial evidence. Von Pervieux v. INS, 572 F.2d 114, 118-119 (3d Cir. 1978); Carrillo-Gonzalez v. INS, 353 F.3d 1077, 1079 (9th Cir. 2003). We will uphold the BIA's interpretation of the INA "unless the interpretation is 'arbitrary, capricious or manifestly contrary to the statute.'" Ahmed v. Ashcroft, 341 F.3d 214, 216-217 (3d Cir. 2003) (citations omitted).

## III.

Under the INA, the Attorney General has authority to grant adjustments of status to aliens who meet certain requirements. See INA § 245(a); 8 U.S.C. § 1252(a). The question here is whether Singh was "admissible to the United States for permanent residence." See INA § 245(a); 8 U.S.C. § 1252(a). He was inadmissible if he "has engaged in a terrorist activity." INA § 212(a)(3)(B)(i)(I) (2002); 8 U.S.C. § 1182(a)(3)(B)(i)(I) (2000 & 2002 Supp.). The INA definition of engaging in a terrorist activity includes the provision of "material support:"

> As used in this chapter, the term "engage in terrorist activity" means, in an individual capacity or as a member of an organization –
>
> . . .
>
> (VI) to commit an act that the actor knows, or reasonably should know, affords material support, *including* a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or

5

identification, weapons (including chemical, biological, or radiological weapons), explosives of training –

(aa) for the commission of a terrorist activity;

(bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;[5]

. . . .

INA § 212(a)(3)(B)(iv) (2002), 8 U.S.C. § 1182(a)(3)(B)(iv) (2000 & 2002 Supp.) (emphasis added).

---

[5] The INA defines "terrorist activity:"

As used in this chapter, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

(I) The hijacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

(II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

(III) A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a person.
(IV) An assassination
(V) The use of any –

(a) biological agent, chemical agent, or nuclear weapon or device, or
(b) explosive, firearm or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

(VI) A threat, attempt, or conspiracy to do any of the foregoing.

INA § 212(a)(3)(B)(iii) (2002); 8 U.S.C. § 1182(a)(3)(B)(iii) (2000 & 2002 Supp.).

The BIA stated that the Department of State had designated Babbar Khalsa as a terrorist organization. None of the organizations to which Singh belonged, including Babbar Khalsa, are among the thirty-six Foreign Terrorist Organizations ("FTO") designated by the United States Department of State in accordance with INA § 219, 8 U.S.C. § 1189. See 31 C.F.R. Ch. V, App. A. Babbar Khalsa and the International Sikh Youth Federation, however, were named by the Department of the Treasury on June 27, 2002, as Specially Designated Global Terrorist ("SDGT") organizations in accordance with an asset-freezing program authorized in 2001 by Presidential Executive Order 13224. See 31 C.F.R. Ch. V, App. A; see also Audrey Kurth Cronin, "The 'FTO List' and Congress: Sanctioning Designated Foreign Terrorist Organizations," CRS Report for Congress (Oct. 21, 2003).

We need not, however, determine whether the BIA erred in retroactively applying the SDGT designations to the organizations with which Singh interacted in India prior to 1989. Nor do we need to consider whether Babbar Khalsa, Sant Jarnail Singh, the International Sikh Youth Federation or any other group was a terrorist organization within the meaning of INA § 212(a)(3)(B)(iv)(VI)(cc) or (dd), 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(cc) or (dd). Rather, our task tracks the narrow compass of determining whether Singh's conduct in providing food and setting up tents constituted "material support" either "for the commission of terrorist activity"

or "to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity." INA § 212(a)(3)(B)(iv)(VI)(aa) and (bb); 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(aa) and (bb). This is so because inadmissibility results from provision of material support either to those who have committed or plan to commit terrorist activity or to terrorist organizations. See INA § 212(a)(3)(B)(iv)(VI), 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). The BIA based its decision on the former.

We must first determine whether the type of activity in which Singh engaged comes within the statutory definition of "material support" as a matter of law. If we conclude that it does, we must then decide whether Singh's conduct constituted "material support" as a matter of fact.

IV.

We turn now to the statute. We start with "the language employed by Congress, . . . and we assume that the legislative purpose is expressed by the ordinary meaning of the words used." INS v. Phinpathya, 464 U.S. 183, 189 (1984) (internal quotations and citations omitted). The word "material" means "[h]aving some logical connection with the consequential facts." Black's Law Dictionary 991 (7th ed. 1999). It also means "significant" or "essential." Id. Support is defined as: "[s]ustenance or maintenance; esp., articles such as food and clothing that allow one to live in the

7

degree of comfort to which one is accustomed." Id. at 1453.

In illustrating the concept of "material support" to those engaged in terrorist activities, INA section 212(a)(3)(B)(iv)(VI) provides various examples that broadly cover the areas of lodging, communications, transportation, financing, weapons and provision of other means to accomplish terrorist activities. The list presented in INA section 212(a)(3)(B)(iv)(VI), supra, is not exhaustive. No language in the statute limits "material support" to the enumerated examples. Use of the term "including" suggests that Congress intended to illustrate a broad concept rather than narrowly circumscribe a term with exclusive categories. See In re SGL Carbon Corp., 200 F.3d 154, 160 (3d Cir. 1999) (stating that a statute in which the word "including" was followed by a list of factors "strongly suggests those factors are not exhaustive").

That the federal statute criminalizing the provision of "material support or resources" to terrorists, 18 U.S.C. section 2339A,[6] includes a longer

list of examples does not lead to the conclusion that INA section 212(a)(3)(B)(iv)(VI) must be read as an exhaustive list. We are familiar with the canon of statutory construction urged on us by Singh: "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." INS v. Cardozo-Fonseca, 480 U.S. 421, 432 (1987) (internal quotation and citation omitted).

This canon, however, is not applicable in this case. First, the two statutes were not enacted by the same Congress. The INA provision was adopted in 1990 and revised in 2001, and the criminal provision was adopted in 1994. See Immigration Act of 1990, Pub. L. No. 101-649, § 601(a), 104 Stat. 4978, 5067-5070 (1990); Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism ("USA PATRIOT") Act of 2001, Pub. L. No. 107-56, §411(a)(1), 115 Stat. 272, 345-347 (2001); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 120005(a), 108 Stat. 1796, 2022 (1994). Thus, we cannot say that the differences in the two statutes are "significantly highlighted by the fact that the same Congress simultaneously drafted" them. Cardozo-

---

[6] "In this section, the term 'material support or resources' means currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and

other physical assets, except medicine or religious materials." 18 U.S.C. § 2339A(b).

8

Fonseca, 480 U.S. at 432. Second, it would be incongruous to conclude that a person who provides food and sets up tents for terrorists could be jailed for up to life under 18 U.S.C. section 2339A, but the same conduct could not prohibit admission to the United States under INA section 212. See United States v. Hodge, 321 F.3d 429, 434 (3d Cir. 2003) (stating avoidance of "unintended or absurd results" is a "deeply rooted rule of statutory construction") (internal quotations and citation omitted).

For the reasons described above, the BIA's conclusion that Congress intended INA section 212(a)(3)(B)(iv)(VI) to include provision of food and setting up tents within the definition of "material support" was not "arbitrary, capricious or manifestly contrary to the statute." Ahmed, 341 F.3d at 216-217; see also McMullen v. INS, 788 F.2d 591, 599 (9th Cir. 1988) (rejecting as "too narrow" the petitioner's argument that the nonpolitical crimes exception to withholding of deportation in the former INA section 243(h), 8 U.S.C. section 1253(h), applied "only to those who actually 'pulled the trigger'" and holding instead that it encompassed those who provide "the physical and logistical support that enable, modern terrorist groups to operate").

V.

We must now apply the foregoing precepts to the facts in this case.

A.

In response to questioning from the IJ at a hearing on January 22, 1997, Singh described his role in meetings of Sant Jarnail Singh followers:

> Q. Well, but in this statement, sir, that I just read to you, you say there were known activities that you took against the Indian government. What were those activities?
>
> A. Sant Jarnail Singh organized meetings in different villages to propagate religion.
>
> Q. So, in other words you're telling me that you attended these meetings, correct?
>
> A. Yes. We used to have those people to arrange our tents and put some – some sort of – arrange preparation of the food and also arrange to bring people to these gatherings and then take them back to their places.

(A.R. at 115-116.)

Later in the same hearing, Singh responded to questions from the INS attorney:

> Q. So, in other words, you were helping the militants who were involved in terrorist activities? Isn't that true?

9

A.When we came from far away to this (indiscernible) congregation, then we may have some contact. We never help in any other way than giving them food. Yes.

(A.R. at 124.)

Taking Singh's statement of minimal participation, it is beyond cavil that Singh furnished food and shelter to Sant Jarnail Singh followers participating in meetings. The sole remaining issue is whether the individuals to whom Singh provided food and shelter come within the rubric of INA section 212(a)(3)(B)(iv).

B.

We must now decide whether substantial evidence supports the BIA's determination that Singh provided food and shelter to individuals who he knew or reasonably should have known had committed or planned to commit terrorist activity.

We begin with the statutory definition of "terrorist activity" as "any activity which is unlawful under the laws of the place where it is committed" and involving, among other things, "[t]he use of any . . . explosive, firearm or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property." INA § 212(a)(3)(B)(iii), 8 U.S.C. § 1182(a)(3)(B)(iii). The evidence is clear that at the time of Singh's participation with them, the members of the various militant Sikh organizations opposed to the Indian government had committed or planned to commit terrorist activity.

Although Singh stated that the purpose of the meetings at which he provided food and shelter was to propagate the teachings of Sant Jarnail Singh, he did not elaborate at the January 22, 1997 hearing on the content of those teachings. In his first affidavit, however, Singh stated: "Sant Jarnail Singh Bhindrawala was never inclined to be militant. However, after his death his group became militant because of the violence perpetrated upon him and his and his [sic] followers by the Indian Military."

A 1985 Amnesty International Report submitted by Singh as part of his asylum application related a June 5, 1984 battle, where "heavy fighting ensued between the army and the followers of Sant Jarnail Singh Bhindranwale, the Sikh fundamentalist leader who had taken refuge in the temple and who the government blamed for directing much of the violence in the Punjab in recent years."

Although Babbar Khalsa and the International Sikh Youth Federation, groups to which Singh belonged, were not named Specially Designated Global Terrorist organizations until 2002, it does not follow that members of those groups were not involved in terrorist activities prior to 1989. In commenting on Singh's asylum application in 1992, the State Department concluded that: the International Sikh Youth Federation was a

"radical off-shoot" of another group; that the Khalistan Commando Force, to which Singh had taken an oath, was "a notorious terrorist group responsible for a grisly April 1985 random killing in a Punjab village"; and that Babbar Khalsa was "equally notorious," was "an even more fundamentalist terrorist group with a reputation for its use of explosives" and was responsible for bombings that killed innocent people.

The activities described by the State Department come within the meaning of the INA's definition of terrorist activities because they involved assassinations and use of explosives "with intent to endanger, directly or indirectly, the safety of one or more individuals." INA § 212(a)(3)(B)(iii)(IV) and (V) (2002); 8 U.S.C. § 1182(a)(3)(B)(iii)(IV) and (V) (2000 & 2002 Supp.). The Amnesty International Report and Singh's own statements provide evidence that the followers of Sant Jarnail Singh also engaged in terrorist activities within the meaning of the INA.

Even in light of the recantations made in his second affidavit, Singh's self-described activities in conjunction with his membership in various militant Sikh organizations consisted of: (1) providing food to militant Sikhs who had committed or planned to commit terrorist activity; and (2) setting up tents for meetings of militants who had committed or planned to commit terrorist activity.[7]

Although Singh himself denied participating directly in any violence, substantial evidence supports the BIA's determination that he knew or should have known the militant Sikhs to whom he provided food and shelter had committed or planned to commit terrorist activities within the meaning of the statute. That is sufficient to render Singh inadmissible under INA § 212(a)(3)(B)(iv)(VI)(bb). Because he was inadmissible, Singh did not meet the requirements for adjustment of status. INA § 245(a), 8 U.S.C. § 1252(a).

The petition for review will be denied.

---

[7] Although other matters were presented by affidavit and testimony at administrative hearings, our review is confined to the bases upon which the BIA relied for its order. See Securities and Exchange Comm'n v. Chenery Corp., 332 U.S. 194, 196 (1947) ("[W]e emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."). Here, the grounds are "offering food and helping to arrange shelter."

FISHER, *Circuit Judge*, *dissenting*.

Finding that Singh-Kaur helped members of Sikh militant groups "by giving them food and helping to set up tents," the Board of Immigration Appeals ("BIA") held that Singh-Kaur "engaged in terrorist activities." However, Singh-Kaur testified that the meetings were for religious purposes, and the BIA did not find Singh-Kaur's testimony to lack credibility. The issue here is therefore straightforward – whether providing food and tents for such meetings, without more, constitutes "engag[ing] in terrorist activity" through provision of "material support." The acts here are not of the degree and kind contemplated by the "material support" provision – *material* acts in support of terrorism. Because the majority's holding ignores the plain language of the statute by reading "material" out of "material support," I respectfully dissent.

## I.

Before addressing the statute, it is necessary to clarify the scope and standard of our review. The majority does not at first restrict its discussion to the BIA's findings, and recites in detail material from Singh-Kaur's 1991 asylum application. See Maj. Op. at 2-5. Although those facts cast Singh-Kaur in an unfavorable light, the majority ultimately concedes in a footnote that Singh-Kaur's asylum application was not relevant to the BIA's decision, which rested solely on food and

tents. See Maj. Op. at 11 n.7.[8] Indeed, the BIA, in reversing the order of the Immigration Judge ("IJ"), did not recite or rely upon the 1991 asylum application at all. And although we do not review the findings of the IJ, he accepted Singh-Kaur's testimony disclaiming the asylum application in finding Singh-Kaur eligible for adjustment of status. Thus, our scope of review is limited to the BIA's stated basis of "offering food and helping to arrange shelter" for these meetings. See also Ernesto Navas v. INS, 217 F.3d 646, 658 n.16 (9th Cir. 2000) (we "cannot affirm the BIA on a ground upon which it did not rely").[9]

It must be further noted that Singh-Kaur testified that the food and tents were set up for religious meetings. Neither the

---

[8]As acknowledged in the footnote, the majority concedes that "[a]lthough other matters were presented by affidavit and testimony at the administrative hearings, our review is confined to the bases upon which the BIA relied for its order." Maj. Op. at 11 n.7 (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)).

[9]"The final order we normally review is the decision of the BIA, unless the BIA defers to the IJ's findings." Miah v. Ashcroft, 346 F.3d 434, 439 (3d Cir. 2003) (citing Abdulai v. Ashcroft, 239 F.3d 542, 549 n.2 (3d Cir. 2001)). Here, the BIA did not defer, expressly or by necessary implication, to the IJ's findings. Accordingly, we review the order of the BIA.

IJ nor the BIA made an adverse credibility finding. Because the BIA did not adopt or defer to the IJ's finding on credibility, we "must proceed as if [petitioner's] testimony were credible and determine whether the BIA's decision is supported by substantial evidence in the face of his assumed (but not determined) credibility." Kayembe v. Ashcroft, 334 F.3d 231, 235 (3d Cir. 2003); see also Lim v. INS, 224 F.3d 929, 933 (9th Cir. 2000) (where neither IJ nor BIA make express credibility findings, court must accept testimony as true). Therefore, we must assume Singh-Kaur's testimony before the IJ to be true.

In addition, it must be noted – as the majority implicitly concedes – that the BIA erred in finding that the Babbar Khalsa and Sant Jarnail Singh Bhindra Wala (hereinafter, "Sant Jarnail") groups had been designated terrorist organizations by the Department of State.[10] See Maj.

---

[10]As noted by the majority, see Maj. Op. at 7, neither organization has been designated a Foreign Terrorist Organization by the Department of State in accordance with INA § 219, 8 U.S.C. § 1189. See 31 C.F.R. Ch. V, App. A. The majority correctly notes that Babbar Khalsa was designated as a Specially Designated Global Terrorist organization in accordance with an asset-freezing program authorized by Presidential Executive Order 13224 in 2001. See 31 C.F.R. Ch. V, App. A. However, the Specially Designated Global Terrorist designation was done by the Department of Treasury and not the Department

Op. at 7. Thus, as the majority appears to agree, the BIA's holding cannot be upheld on the basis that Singh-Kaur provided "material support" to a terrorist organization. Rather, the BIA's holding rests solely on the narrow ground that the provision of food and tents prior to 1989 to unnamed members of the Babbar Khalsa and Sant Jarnail organizations was the provision of "material support . . . to any individual the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity." However, the record does not contain any evidence as to what terrorist acts, if any, these unnamed individuals committed or planned to commit.

Regarding our standard of review, the BIA's interpretation of the statute cannot be upheld under any standard. The majority appears to apply Chevron deference, see Maj. Op. at 5, but as the statute is unambiguous and its meaning is plain, unbridled agency deference is unwarranted. As the Supreme Court held in INS v. St. Cyr, 533 U.S. 289 (2001), we only defer "to agency interpretations of statutes that, applying the normal 'tools of statutory construction,' are ambiguous." Id. at 320 n.45 (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n.9 (1984)); see also Steele v. Blackman, 236 F.3d 130, 133 (3d Cir. 2001) ("Where the language of a statute is clear, however, the

---

State, and is not the same as Foreign Terrorist Organization designation.

13

text of the statute is the end of the matter.").[11]

## II.

Examining the statute's plain language and employing the "normal tools of statutory construction," I conclude that Congress did not intend "material support" to embrace acts that are not of importance or relevance to terrorism. To hold

---

[11]In any case, the conclusion does not hinge upon the standard of review. As the majority states in reciting the standard for Chevron deference, "[w]e will uphold the BIA's interpretation of the INA unless the interpretation is arbitrary, capricious or *manifestly contrary to the statute*." Maj. Op. at 5 (quoting Ahmed v. Ashcroft, 341 F.3d 214, 216-217 (3d Cir. 2003) (citations omitted)) (quotations omitted and emphasis added). Here, the BIA's construction is manifestly contrary to the statute's plain meaning because it reads "material" out of "material support," so under any standard of review, the majority's conclusion cannot stand. Indeed, even where Chevron deference is applicable, we nevertheless consider the "thoroughness evident in [the agency's] consideration" and "the validity of its reasoning." Sierra v. Romaine, 347 F.3d 559, 569 (3d Cir. 2003), pet. for cert. filed, (U.S. Jan 27, 2004) (No. 03-8662). Here, the BIA supplies no reasoning beyond the bare assertion that food and tents constitute "material support." Thus, under any standard, the conclusion remains the same.

otherwise reads "material" out of "material support" and treats half of the statutory term as surplusage. Such a result is inconsistent with the plain language of the statute and with the normal tools of statutory construction.

Section 245 of the Immigration and Nationality Act ("INA") provides that an alien may be eligible for adjustment of status, if, among other things, he is "admissible to the United States for permanent residence." INA § 245(a), 8 U.S.C. § 1255(a). Section 212, in turn, provides that any alien who "has engaged in a terrorist activity" is inadmissible. INA § 212(a)(3)(B)(i)(I), 8 U.S.C. § 1182(a)(3)(B)(i)(I). Thus, we must determine whether the BIA properly found that Singh-Kaur had "engaged in a terrorist activity." Under INA § 212, "engage in terrorist activity" means, among other things:

> (VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training–
>
> (aa) for the commission of a terrorist activity;
>
> (bb) to any individual who the actor knows, or reasonably should

14

know, has committed or plans to commit a terrorist activity;

(cc)   to a terrorist organization described in clause (vi)(I) or (vi)(II); or

(dd)   to a terrorist organization described in clause (vi)(III), unless the actor can demonstrate that he did not know, and should not reasonably have known, that the act would further the organization's terrorist activity.

INA § 212(a)(3)(B)(iv)(VI), 8 U.S.C. § 1182(a)(3)(B)(iv)(VI).

I agree with the majority's threshold canon that "'we assume that the legislative purpose is expressed by the ordinary meaning of the words used.'" Maj. Op. at 7 (quoting INS v. Phinpathya, 464 U.S. 183, 189 (1984) (internal quotations and citations omitted)). Employing that canon, I have no doubt that the term "support," in isolation, could embrace food and tents. As noted by the majority, support is defined as: "Sustenance or maintenance; esp., articles such as food and clothing that allow one to live in the degree of comfort to which one is accustomed." Id. (quoting Black's Law Dictionary 1453 (7th ed. 1999)). Had the statute referred to mere "support," I might concur with my colleagues, as substantial evidence shows that "support" was afforded.

But the analysis does not end there because "material" qualifies "support." The majority correctly notes two meanings

for "material" in this context – "[h]aving some logical connection with the consequential facts," and "significant" or "essential." Id. (quoting Black's, supra, at 991). Similarly, Webster's defines "material" in part as "being of real importance or great consequence." Webster's Third New Int'l Dict. 1392 (1981).

Even a cursory examination of the "material support" provision makes it clear that both meanings of "material" – relevance and importance – are embraced by the statute. Regarding relevance, the statute's express language requires an act that "affords material support" that is either "*for* the commission of a terrorist activity," "*to* any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity," or "*to* a terrorist organization." Thus, the support must be *relevant* to the specified terrorist goal, terrorist persons, or terrorist organizations, which in sum means that the support must be relevant to terrorism. Regarding importance, the statute recites a laundry list of types of "material support" that are relevant to terrorism – safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training. All are plainly important to terrorism, terrorists, or terrorist organizations. Thus, the support must be *important* to terrorism.

15

Therefore, even under the broadest possible reading, "material" in this context must mean both "important" and "relevant" to terrorism. "Material support," by its plain language, means that *the act affording support must be of a kind and degree that has relevance and importance to terrorist activity, terrorists, or terrorist organizations.* Put another way, an act "affording material support" must move the ball down the field for terrorism. This is not to say that under certain circumstances, food and shelter could not be "material support." But as these are normal types of "support," the facts must show that they are more than *mere* support – i.e., they must be of relevance and importance to terrorism.

The conclusion that "material" means both importance and relevance is underscored by further examination of the statute. First, mere "support" cannot be "material support." As noted, "support" means "sustenance or maintenance." There is no doubt that sustenance, such as food and water, or maintenance, such as shelter, are necessary for life, but they are not *per se* necessary for terrorism. To hold differently would – in cases like this one, involving food and tents – automatically transmute mere "support" into "material support." This would eviscerate the statute. Had Congress intended the mere provision of food and shelter, without more, to be "engag[ing] in terrorist activity," there would have been no need to include the term "material" in the statute. An indisputable axiom of statutory construction is that "whenever possible each word in a statutory provision is to be given meaning and not to be treated as surplusage." Acceptance Ins. Co. v. Sloan, 263 F.3d 278, 283 (3d Cir. 2001) (quotation marks omitted); see also Ki Se Lee v. Ashcroft, 368 F.3d 218, 223 (3d Cir. 2004) ("we should adopt a construction which recognizes each element of the statute").[12] Here, "material" has an obvious meaning and is not surplusage.

Second, the examples of "material support" provided in the statute all regard acts of importance and relevance to terrorism, terrorists, and terrorist organizations – safe houses, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training. This reinforces the conclusion

---

[12]Food and shelter indeed could be, under certain circumstances, important and relevant to terrorism. It is not impossible to imagine a hypothetical situation where a dying terrorist begs an alien for a glass of water so that he can survive long enough to walk the last half-mile to complete his terrorist aim. Under those circumstances, the support would be more than mere support, as it had relevance and importance to terrorism under those circumstances. But as discussed in Part III, infra, that situation is not before us.

that "material support" means exactly that, support that is material.[13]

That fact that the listing of types of "material support" is not exhaustive does not transform any type of support into material support. I do not disagree with the majority that the use of "including" before the laundry list means that the enumerated listing is not exhaustive. See In re SGL Carbon Corp., 200 F.3d 154, 160 (3d Cir. 1999) (use of "including" followed by a listing of factors "strongly suggests those factors are not exhaustive"). However, it does not follow that any kind of support is material support. Indeed, the majority ignores the canon that "[a]nother 'commonplace [rule] of statutory

---

[13]In its decision, the BIA recited the prior version of INA § 212. This provision was amended and expanded in 2001 pursuant to the PATRIOT Act. See Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism, Pub. L. No. 107-56, § 411(a)(1)(F), 115 Stat. 272 (2001) ("PATRIOT Act"). Petitioner concedes the current version applies, so the analysis above focuses on the law as it exists now. Under either version, the BIA's conclusion does not comport with the plain language. It should be noted that in the PATRIOT Act, Congress added "chemical, biological, or radiological weapons" to the laundry list of activities constituting "material support." The gravity of such activities reinforces the conclusion that "material support" is not "immaterial support."

construction' is that the 'specific governs the general.'" Ki See Lee, 368 F.3d at 223 (quoting Doe v. Nat'l Bd. of Medical Examiners, 199 F.3d 146, 154–55 (3d Cir. 1999)) (alteration in original). Here, the enumerated examples, consistent with the plain language of the term "material support," are all acts that can be of importance and relevance to terrorism. Any unenumerated act that is alleged to constitute "material support" must therefore be measured by the plain language of the term "material support" and the nature of the enumerated examples. Even the enumerated act that is arguably the closest to the facts at hand here – provision of a "safe house"[14] – is plainly of a degree and kind that is important and relevant to terrorism and far different from the mere provision of food and tents.[15]

---

[14]Strangely, the majority states that the express language of the statute embraces "lodging." Maj. Op. at 8. However, the statute does not include the term "lodging," but only "safe house." By asserting that "lodging" is "material support" without explanation, the majority begs the question before us – whether tents and food are "material support" in the first place. Safe houses by definition aid and abet in terrorism, whereas lodging might not.

[15]Thus, I disagree with my colleagues that the mere fact that the listing is not exhaustive means that "the BIA's conclusion that Congress intended INA § 212(a)(3)(B)(iv)(VI) to include provision

Third, my conclusion is further confirmed by the statute's surrounding provisions. In determining Congress' intent, "we look to the statute's language, structure, subject matter, context, and history–factors that typically help courts determine a statute's objectives and thereby illuminate its text." Almendarez-Torres v. United States, 523 U.S. 224, 228 (1998); Beecham v. United States, 511 U.S. 368, 372 (1994) ("The plain meaning that we seek to discern is the plain meaning of the whole statute, not of isolated sentences."). Here, "afford[ing] material support" is but one of six examples of "engaging in terrorist activity." INA § 212(a)(3)(B)(iv), 8 U.S.C. § 1182(a)(3)(B)(iv). These other examples of "engaging in terrorist activity" are all grievous forms of conduct whose relevance and importance to terrorism are indisputable: (1) committing or inciting terrorist activity; (2) preparing or planning terrorist activity; (3) gathering information on potential targets for terrorist activity; (4) soliciting funds or other things of value for a terrorist activity or organization; and (5) soliciting any individual to engage in terrorist activity or to join a terrorist organization. INA § 212(a)(3)(B)(iv)(I)-(V), 8 U.S.C. § 1182(a)(3)(B)(iv)(I)-(V).

As the majority rightly suggests in a different context, avoiding "unintended or absurd results" is a "deeply rooted rule of statutory construction." United States v. Hodge, 321 F.3d 429, 434 (3d Cir. 2003). It would be absurd for five of the definitions of "engage in terrorist activity" to be of import and gravity, but for the sixth definition to be otherwise. "Statutory construction is a holistic endeavor ... and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." Tineo v. Ashcroft, 350 F.3d 382, 391 (3d Cir. 2003) (parenthetically quoting United States Nat'l Bank of Or. v. Indep. Ins. Agents of America, Inc., 508 U.S. 439, 455 (1993)) (alteration in original). As each disjunctive example of "engage in terrorist activity" is a significant form of conduct that materially furthers the goals of terrorism, so does "material support."[16] See Beecham, 511 U.S. at 371 ("That

---

of food and setting up tents within the definition of 'material support' was not 'arbitrary, capricious or manifestly contrary to the statute.'" Maj. Op. at 9. For one thing, Chevron deference is not warranted as the plain language compels the opposite conclusion from that reached by the BIA. For another, even under Chevron, the BIA's reading is "manifestly contrary" to the statute to the extent the BIA concluded that food and tents, without more, constitute "material support."

---

[16]Further examination of the surrounding portions of INA § 212 only reinforces this conclusion. The definitions of "terrorist activity" and the ultimate ban on admissibility for those engaging in such activity both recite conduct of extreme gravity. See INA § 212(a)(3)(B), 212(a)(3)(B)(iii), 8 U.S.C. § 1182(a)(3)(B), 1182(a)(3)(B)(iii).

18

several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well.").

As a final matter, I turn briefly to the criminal material support statute, 18 U.S.C. § 2339A. Both Singh-Kaur and the majority argue that the statute supports their respective positions. The statute, entitled "Providing material support to terrorists," prohibits the provision of "material support or resources" for preparing or carrying out any of a list of enumerated terrorist and other significant crimes.[17] Unlike INA §

212, the definition of "material support or resources" in § 2339A includes both safe houses *and* lodging.

I disagree with Singh-Kaur, who argues that under the maxim of *expressio unius est exclusio alterius*, the presence of "lodging" in § 2339A, and its absence in INA § 212, means that Congress did not intend "lodging" to be "material support" for purposes of § 212. As noted above, the listing in INA § 212 is not exhaustive. Thus, the real question, as discussed

---

[17]18 U.S.C. § 2339A provides:

(a) Offense.–Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 1993, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, or 2340A of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), or section 46502 or 60123(b) of title 49, or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

(b) Definition.–In this section, the term "material support or resources" means currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

above, is not whether non-enumerated conduct can be "material support," but whether non-enumerated supportive acts rise to the requisite level of materiality.

I also part with the majority, which concludes that the existence of § 2339A requires that we construe INA § 212 so broadly that we read "material" out of the statute. The majority suggests that "it would be incongruous to conclude that a person who provides food and sets up tents for terrorists could be jailed for up to life under 18 U.S.C. § 2339A, but the same conduct could not prohibit admission to the United States under INA § 212." Maj. Op. at 9.

The majority's suggestion of incongruity is easily dismissed. Section 2339A requires that the "material support or resources" be provided by a person, "knowing or intending that they are to be used in preparation for, or in carrying out" a long list of specific and extremely serious crimes of terror.[18] Under that statute, the mere provision of food and tents, even to a terrorist, would not be a criminal act unless the "material support or resources" were knowingly or intentionally supplied "to be used in preparation for, or in carrying out" one of § 2339A's specified and grievous terrorist crimes.

Thus, one could not be jailed under § 2339A, let alone jailed for life,[19] for providing a terrorist with a glass of water, unless, for example, the water was heavy water that the defendant knows or intends be used to develop a nuclear weapon. The majority does not explain how the mere provision of food and tents, without more, might constitute knowing or intentional provision of "material support or resources" that are "to be used in preparation for, or in carrying out" terrorist acts such as hijacking or unleashing weapons of mass destruction. In sum, there is no incongruity,[20] and § 2339A

_____

[18]The statute lists over thirty specific, serious acts of criminal terror that include destruction of aircraft, 18 U.S.C. § 32; violence at international airports, 18 U.S.C. § 37; prohibitions with respect to biological weapons, 18 U.S.C. § 175; use of chemical weapons, 18 U.S.C. § 229; assassination and kidnapping of members of Congress, the Cabinet, and the Supreme Court, 18 U.S.C. § 351; transactions involving nuclear materials, 18 U.S.C. § 831; and many more crimes, nearly all obviously terroristic and hugely significant

in nature.

[19]I note that the majority's hypothetical sentence of life imprisonment under § 2339A could not even arise unless the tents and food were somehow used in preparation for or in carrying out a serious act of terrorism that led to death. Nowhere does the majority explain how Singh-Kaur's food and tents was connected, directly or indirectly, to any death.

[20]Indeed, I believe that under appropriate circumstances – not at hand here – a glass of water could constitute "material support" under INA § 212 as

does not support the majority's attempt treat INA § 212's recitation of "material" as surplusage.

"Material support," by its plain language, means that the act affording support must be of a kind and degree that has relevance and importance for terrorist activity, terrorists, or terrorist organizations, and cannot be mere support. In the next section, I apply this plain reading to the facts of the case and conclude that Singh-Kaur's mere support does not rise to the requisite level of materiality.

## III.

Applying the facts to the law, substantial evidence does not support the BIA's finding that Singh-Kaur provided "material support." Nothing in the record shows how the food and tents were important and relevant to terrorism, and indeed, Singh-Kaur testified that they were provided for religious meetings. The majority therefore relies on speculation by concluding that mere support to unnamed persons who may or may not have engaged in unknown terrorist activities constitutes "material support." This conclusion

---

well, so long as the water was relevant and important to terrorism. See note 5, supra (noting that under INA § 212, a glass of water may constitute "material support" where it was provided to a terrorist so that he can survive long enough to walk the last half-mile to complete his terrorist aim because such support would be both important and relevant to terrorism).

substitutes conjecture for proof and reads "material" out of "material support."

Here, the majority concludes that "[t]he evidence is clear that at the time of Singh's participation with them, the members of the various militant Sikh organizations opposed to the Indian government had committed or planned to commit terrorist activity." Maj. Op. at 10. The majority bases its holding on five premises: (1) Singh-Kaur supplied food and tents (2) prior to 1989 (3) to unnamed members of the Babbar Khalsa and/or Sant Jarnail organizations (4) who engaged in unnamed terrorist acts or planned to engage in such unnamed acts, and (5) Singh-Kaur knew or should have known that these unnamed individuals engaged in unnamed terrorist acts or planned to engage in such unnamed acts.

At best, only the first three premises are supported by the record. There is no dispute that Singh-Kaur supplied food and tents prior to 1989 to unnamed members of at least one of these organizations. But the administrative record contains nothing about whether the individuals at issue had engaged in terrorist acts or planned to do so. Indeed, the record is to the contrary – Singh-Kaur testified that the meetings were for religious purposes. The IJ did not find Singh-Kaur's testimony to lack credibility and the BIA did not find otherwise; we therefore "must proceed as if [petitioner's] testimony were credible and determine whether the BIA's decision is supported by substantial evidence in the face of his assumed (but not determined) credibility." Kayembe, 334 F.3d at 235;

see also Lim, 224 F.3d at 933 (where neither the IJ nor the BIA expressly made credibility findings, Court must accept testimony as true). Nor did the BIA base its finding on other evidence of record, such as the disclaimed 1991 asylum affidavit.

Accordingly, we are limited to the BIA's finding that Singh-Kaur supplied food and tents, and we must assume that his testimony before the IJ was true. In this regard, it is helpful to review the testimony:

> IJ: Sir, I want to read to you something that you wrote in an asylum application that you gave to the Immigration Service. You say "I am on the military and police wanted list because of known and suspected activities against the government and when I left I had failed to meet their reporting requirements." Now, my first question to you, sir, is this. Were you on a military and police wanted list in India, sir?
>
> A: Yes, on police.
>
> Q: Why?
>
> A: Because I baptized. After [the] killing of Jarnail Singh [by Indian authorities], they made a list of all those people who got baptized and then they started catching all those people.
>
> Q: So, it was only because you were baptized as a Sikh, sir. Is that what you mean?

> A: Yes, because I was baptized. That's why.
>
> Q: Well, but in this statement, sir, that I just read to you, you say there were known activities that you took against the Indian government. What were those activities?
>
> A: Sant Jarnail Singh organized meetings in different villages to propagate religion.
>
> Q: So, in other words you're telling me that you attended these meetings, correct?
>
> A: Yes. We used to have those people to arrange our tents and put some – some sort of – arrange preparation of the food and also arrange to bring people to these gatherings and then take them back to their places.
>
> Q: Did you do anything else?
>
> A: No.
>
> Q: Sir, when you say here there were known activities against the Indian government, that is what you're referring to, sir?
>
> A: We were not against government, but we were propagating the teachings of our Sant.
>
> . . . .
>
> Q: . . . Were you ever involved in any violent activities against the Indian government – wait until I

finish, please, sir – in support of an independent Sikh state?

A: Yes. We want Khalistan, but we don't want by the means of violence.

Q: Well, I want you to answer the question I asked you, sir. You have not answered it. Were you ever involved in any violent activity in India?

A: No.

A review of this testimony makes it clear that Singh-Kaur disclaimed any connection to violence. It also shows that the meetings at question were "to propagate religion." It further shows that the tents and food were supplied to members of Sant Jarnail. Nothing in the testimony reflects that the purpose or subject of the meetings was to facilitate terrorism.

Shortly thereafter, the government's lawyer questioned Singh-Kaur:

Q: Sir, according to your application for asylum, you joined the Babbar Khalsa group in 1993. Is that so?

A: In 1983.

Q: I'm sorry, 1983.

A: I got baptized and then my name was written that he belongs to Babbar Khalsa.

Q: And, according to your application for asylum you joined the Sant Jarnail Singh Bhindra

Wala militant group in 1984. Isn't that correct?

A: I was baptized by Sant Jarnail Singh Bhindra Wala.

Q: And, you joined his group, militant group, in 1984. Isn't that correct?

A: This is not a militant group.

Q: According to your application for asylum, it's called the Sant Jarnail Singh Bhindra Wala militant group.

A: That may be a mistake by my lawyer, but he was saying that by getting baptized you will have your own army, you will have your own garment, you will have your own police.

Q: And, sir, the purpose of this group, according to your application, is to fight for and protect the religious and political cause of the Sikh community. Is that true?

A: This group propagates the religion and whatever the teachings of our ten gurus, that group also propagates those teachings.

Q: And, according to your affidavit, which is attached to your application for asylum, you assisted the freedom fighters in your village in the movement of weapons through your village. Isn't that correct?

23

A: No. We – I used to help by putting that tent and organize the mondo (phonetic sp.) or the tent.

Q: And, it also states that you gave shelter to these militants who were involved in the transport – transportation of weapons. Isn't that true?

A: No, I never kept any weapons. Those Sikhs who were baptized, they used to come and they knew that I am also baptized and I just help them with the – giving them food.

Again, Singh-Kaur disclaimed engaging in militant activities or moving weapons, and he reaffirmed the religious nature of the matter. It is in this context that we must analyze whether the support he provided was "material," i.e., more than mere support, and support of importance and relevance to terrorism.

As a threshold matter and as acknowledged by the majority, the BIA erred in determining that Babbar Khalsa and Sant Jarnail were designated by the State Department as terrorist organizations pursuant to INA § 219. See Maj. Op. at 7; see also note 3, supra. In addition, the testimony above makes it clear that the food and tents were supplied to members of Sant Jarnail. The Sant Jarnail organization has not been designated as a Foreign Terrorist Organization *or* as a Specially Designated Global Terrorist organization, either by the Department of State or the Department of Treasury. Accordingly, the BIA's holding that the State Department has designated Sant Jarnail as a terrorist organization is incorrect and is by itself reversible error.[21]

Recognizing this error, the majority does not hold that Singh-Kaur supplied "material support" to a terrorist organization, but instead, to an "individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity." But the record is devoid of any evidence of who these individuals were, what terrorist activities they had done, or what terrorist acts they planned to commit. There is also no evidence of what Singh-Kaur knew or should have known regarding these unknown activities. The only evidence that the BIA and majority appear to latch upon in this regard is the following exchange at the end of the government's questioning of Singh-Kaur:

Q: So, in other words, you were helping the militants who were involved in the terrorist activities. Isn't that true?

A: When we came from far away to this (indiscernible) congregation, then we may have some contact. We never help in any other way than giving them food. Yes.

---

[21]The BIA's errors regarding the status of the two entities are inextricably interwoven with the ultimate conclusion that the provision of food and tents to members of these organizations was "material support." This basis alone warrants granting of the petition.

24

The BIA and majority rely on this passage to conclude that Singh-Kaur admitted to having offered support to "militants who were involved in terrorist activities." Therefore, the majority upholds the BIA's finding that Singh-Kaur offered "material support . . . to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity."

The majority's reliance on this passage is questionable at best. Although admissions may certainly be based on leading questions, it is difficult to know whether or not Singh-Kaur was agreeing to the words put into his mouth by the government lawyer and transmitted through the translator, or what he meant by the response relayed back through the translator. Indeed, moments before, Singh-Kaur had adamantly *denied* that the persons he helped were "militants."[22]

---

[22]The majority also cites to an affidavit Singh-Kaur filed in 1996 in connection with his adjustment of status application, in which he states that "after [Sant Jarnail's] death his group became militant because of the violence perpetrated upon him and his and his [sic] followers by the Indian Military." Maj. Op. at 10. It is unclear how this proves anything. We do not know whether the individuals to whom Singh-Kaur provided food and tents were involved in militant activity at all, whatever that activity might be. Indeed, Singh-Kaur later testified before the IJ that the group was not militant. More fundamentally, there is no indication how

Further, in the context of this appeal, the term "terrorist activity" has a specified legal definition, whereas we have no idea what Singh-Kaur understood the term to mean. At the very least the passage is ambiguous, and at the worst, reliance on the passage fails the substantial evidence test because it requires us to speculate as to what Singh-Kaur was saying "Yes" to.

Despite these concerns, the case need not turn on this issue, because even if we were to assume that Singh-Kaur admitted that the unnamed "militants" had engaged in unspecified "terrorist activity," the BIA still has not established that the food or the tents were material in any way. Nothing in the record shows the type of terrorist activities committed or planned by these unnamed individuals, and nothing shows how the food and tents were relevant and important to these unnamed persons engaging in unknown terrorist activities. Under such circumstances, finding mere support to be "material" support reads "material" out of the statute. Though the BIA might have looked to other bases for its decision, it did not do so, and we cannot raise new bases in the context of a petition for review.[23]

---

or whether unspecified militant activity was "terrorist activity" for purposes of INA § 212. Indeed, Sant Jarnail is not a Foreign Terrorist Organization or a Specially Designated Global Terrorist organization. See note 3, supra.

[23]Although the government argues that Singh-Kaur had the burden of proving he

was not inadmissible, the case does not turn on which party bore the burden of proof. Here, the facts regarding the food and tents were undisputed and Singh-Kaur's testimony must be treated as credible. Under these circumstances, Singh-Kaur's actions do not constitute "material support" regardless of who bears the burden. These circumstances evoke United States v. McGuire, 178 F.3d 203 (3d Cir. 1999), a federal arson case where before the district court, the government rested Commerce Clause jurisdiction solely on the presence of a bottle of Florida orange juice in the trunk of a car used solely for intrastate business. We held that "a conviction under 18 U.S.C. § 844(i) must rest upon more than the dubious interstate commerce nexus of our hypothetical cup of sugar, or the ephemeral nexus of the government's carton of orange juice." Id. at 211-12. We rejected the government's argument on appeal that "we should now look past the orange juice and consider other items that were in the trunk" that might support federal jurisdiction. Id. at 206.

Here, just as in McGuire, although the BIA might have relied upon other information of record to support its conclusion that Singh-Kaur provided "material support," the agency relied solely on the food and tents. The BIA did not rely on the 1991 asylum application, and we may not go searching for bases not relied upon by the agency. Possibly, the BIA could have seized upon the fact that Singh-Kaur testified to providing

Thus, it is apparent that even though the majority concedes that it cannot affirm the BIA on the basis of material support to a terrorist *organization*, it nevertheless uses the affiliation of the unnamed individuals to Sant Jarnail to bootstrap a finding that they engaged in terrorist activities, however unknown those activities may be. But bootstrapping and conjecture are not even close to substantial evidence that the food and tents were material, i.e., relevant and important to terrorism. Where the "conclusion is not based on a specific, cogent reason, but, instead, is based on speculation, conjecture, or an otherwise unsupported personal opinion, we will not uphold it because it will not have been supported by such relevant evidence as a reasonable mind would find adequate." Dia v. Ashcroft, 353 F.3d 228, 250 (3d Cir. 2003) (*en banc*); see also Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002) (findings based on "speculation or conjecture, rather than on evidence in the record, are reversible"). "In other words, [the finding]

---

"transportation" to the individuals at issue, but the BIA did not rely on this basis. See INA § 212(a)(3)(B)(iv)(VI), 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). See Navas, 217 F.3d at 658 n.16 (Court may not affirm BIA on grounds on which the agency did not rely).

will not have been supported by substantial evidence." Dia, 353 F.3d at 250.[24]

## IV.

That the BIA's finding cannot be upheld is underscored through the government's suggestion at oral argument that the provision of a cup of water to a terrorist could constitute "material support." I have no doubt that under the right facts, the provision of a single glass of water to a terrorist could be material support. If bin Laden were dying of thirst and asked for a cup of water to permit him to walk another half mile and detonate a weapon of mass destruction, such support would be "material" to terrorism. But those facts are not before us, and permitting a mere cup of water, without more, to be "material support" reads "material" out of the statute.

In reaching this conclusion, I remain cognizant of the fact that the executive branch is best-equipped to handle the fast-changing circumstances of the war against terror. But courts may not rewrite clear statutes or decide immigration petitions on speculation. Because "material support" does not mean immaterial support, I would grant the petition for review, vacate the order of the BIA, and remand for further proceedings.[25]

---

[24]Along these lines, the majority discusses at length Singh-Kaur's membership in Babbar Khalsa, the International Sikh Youth Federation, and the Khalistan Commando Force. See Maj. Op. at 10-11. However, the food and tents were not provided to these organizations, but to individuals belonging to a different organization, Sant Jarnail. The relevance of these facts to the food and tents is nowhere explained, nor could it be. More fundamentally, the majority cannot and does not identify the terrorist acts that Singh-Kaur provided "material support" for, for *any* group. Although facts about other groups paint Singh-Kaur in an unfavorable light, they do not suffice to provide anything more than speculation as to how his "support" was "material" to anything. Finally, the BIA did not cite to or rely upon Singh-Kaur's membership to such other groups.

[25]Because I conclude that the statute's plain meaning dictates the outcome, I need not rely on the rule of lenity. See St. Cyr, 533 U.S. at 320 ("longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien"); Ki Se Lee, 369 F.3d at 225. Because the statute is unambiguous and plain, the rule of lenity has no bearing here. See Ki Se Lee, 369 F.3d at 227-28 n.13 (Alito, J., dissenting) ("The rule of lenity . . . is reserved for situations in which the normal rules of statutory interpretation are unhelpful."). Nonetheless, our adherence to the rule of lenity in the immigration context provides additional support for the conclusion here.