

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-13-2006

# Lim v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-1077

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Lim v. Atty Gen USA" (2006). *2006 Decisions.* Paper 1595.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1595

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS

FOR THE THIRD CIRCUIT

_____

No. 05-1077

_____

MERRY LIM,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

_____

On Petition for Review of an Order of

The Board of Immigration Appeals

(BIA No. A95-146-859)

Immigration Judge: Rosalind K. Malloy

_____

Submitted Pursuant to LAR 34.1(a)

January 9, 2006

_____

Before: BARRY and AMBRO, <u>Circuit Judges</u>, and

DEBEVOISE<sup>*</sup>, <u>Senior District Judge</u>

(Filed: February 13, 2006)

_____

OPINION OF THE COURT

_____


DEBEVOISE, Senior District Judge

Petitioner, Merry Salim Lim, seeks review of a decision of the Board of Immigration Appeals ("the BIA") affirming without opinion the decision of the Immigration Judge ("the IJ") that denied her application for asylum, withholding of removal and relief under Article 3 of the United Nations Convention Against Torture and Other Civil, Inhuman or Degrading Treatment or Punishment ("the CAT")[1].

We hold that the IJ erred, overlooking critical evidence, when she found that Ms. Lim failed to establish past persecution and fear of future persecution.  We will remand the case for further proceedings in accordance with this opinion.

---

<sup>*</sup>Honorable Dickinson R. Debevoise, Senior District Judge for the District of New Jersey, sitting by designation.

[1]  Ms. Lim moved for a stay of removal and for a stay of the voluntary departure period. The motion for a stay of removal was granted.  The motion for a stay of the voluntary departure period was referred to the merits panel.  We conclude that this court does not have jurisdiction to extend or reinstate or stay the voluntary departure period, and consequently dismiss the motion. <u>Reynoso-Lopez v. Ashcroft</u>, 369 F.3d 275, 283-4 (3d Cir. 2004).

# I. Facts and Procedural History

The IJ found no reason to doubt Ms. Lim's credibility, and consequently reliance may be had upon her recital of events contained in her testimony, her asylum application, and her sworn statement, supplemented by the United States Department of State Country Reports on Human Rights Practices - Indonesia, 2000, 2001 and 2002 ("the Country Reports").

The County Reports describe racial and religious tensions in Indonesia. In 1965 the nationwide social unrest resulted in assaults upon Chinese people generally, killings of Chinese people and burning of Chinese houses. In 1998 racial riots erupted, and again Chinese people and businesses were attacked. As described in the 2001 Country Report: "Ethnic Chinese, who represent approximately 3 percent of the population - by far the largest nonindigenous minority group - historically have played a major role in the economy. In 1998 anti-Chinese sentiment led to serious and widespread attacks on Chinese-owned businesses. Despite the Wahid Government's commitment to reopen the investigation into these attacks, the Megawati government has failed to pursue the 1999 recommendations of the joint fact-finding team (TGPF) that was commissioned to investigate the 1998 attacks."

Ms. Lim testified as follows. She is an ethnic Chinese woman, was born in Medan, Indonesia in 1957. She is a Pentecostal Christian, baptized at age eighteen. Indonesia has been the scene of religious and ethnic violence inflicted by members of the

3

Muslim majority upon the largely Christian Chinese minority. From early childhood until her departure for the United States in 2002, Ms. Lim has encountered this violence, inflicted upon her at least in part because of her Chinese and/or Christian identity.

In 1965, when Ms. Lim was seven years of age, the activities of the Indonesian Communist Party caused nationwide unrest, for which the government and the Indonesian people at large blamed their Chinese citizens. Mobs attacked principally Chinese targets, burning their homes and killing them. Ms. Lim's mother hid Ms. Lim and her three sisters under a bed when their house was targeted by people yelling "Kill Chinese" and throwing stones.

Throughout her childhood Ms. Lim was harassed by native Indonesians on her way to school or when otherwise on the street. She was cursed with religious slurs such as "Chink communist," "Christian Kafir" (atheist) and "Haran" (religiously condemned).

In 1976 Ms. Lim graduated from high school and married an ethnic Chinese and Christian. They moved to his hometown, Padang, and sought to open a business. Padang was a predominantly Muslim city, and after a year Ms. Lim and her husband returned to Medan, where he conducted a clothing business.

In 1980 the couple moved to Jakarta to open a restaurant. The majority of their customers were Chinese and the rest Christian Indonesians. Although Ms. Lim and her husband were not subjected to direct attacks until 1998, attacks on Chinese persons and Chinese Christians flared in various parts of Indonesia. In 1986 there occurred the

4

Tanjung Priok incident in Jakarta. An army officer entered a mosque without taking off his shoes. It was unknown whether he was Chinese, but Muslim people expressed their outrage against Chinese people, assaulting them, burning houses and looting shops. In 1994 religious conflicts erupted in East Java, raising tensions in other areas. In 1996 in the City of Sidoarjo a minister and his family were burned alive when a mob set their church ablaze. Also in 1996 Ms. Lim and her husband made the first of three trips to Singapore to explore whether they could move there and establish a business. They determined that they lacked sufficient funds to make that move.

In 1997 the country faced an economic crisis, and native Indonesians blamed ethnic Chinese. In that same year the Lims made a second exploratory trip to Singapore. In May 1998 racial riots erupted in Jakarta where Chinese people were attacked. Their shops and houses were burned down. Chinese women were gang raped and some killed. The rioting spread to other parts of the country.

On May 13, 1998 Ms. Lim arrived at her restaurant at about 10:00 a.m. to open it. An hour later a group of Indonesian men arrived, vandalized the restaurant and attacked Ms. Lim, touching her breast and attempting to kiss her. She dropped to the floor "too frightened to even look up." The rioters wrote anti-Chinese slogans on the walls and shouted to Ms. Lim anti-Chinese slurs. After they moved on to attack other businesses in this Chinese neighborhood, an Indonesian Christian friend of Ms. Lim's husband escorted her home, physically unharmed but emotionally traumatized. Nothing was left of the

restaurant. Television news described similar events taking place throughout Indonesia. The Indonesian government sent armed forces into the targeted Chinese areas to restore order, but did not succeed in doing so for a week. Anticipating future riots, the Lims did not reopen the restaurant. Ms. Lim remained in her home during the rest of the month of May.

In February 2000 the Lims made a third trip to Singapore to explore the opportunity of opening a business there, but again decided that they could not afford to do so.

On Easter Sunday, 2000, Ms. Lim and her daughter were in a car on their way to church. A group of young Muslim men stopped and surrounded the car. One of the men "snatched [their] bibles and threw them to the ground." Others "grabbed [her] daughter and touched her on her arms, hands, and thighs" and also touched Ms. Lim inappropriately. The men hurled anti-Chinese invective at the two women. One man grabbed Ms. Lim's arm, pulled her close to him and said "This is the last warning[,] you dog. If we ever see you go to church again, we'll kill you." Thereafter Ms. Lim left her home only for her daughter's school activities and to go to church. She took a longer route to her church and disguised their bibles by wrapping them in paper.

It was after the Easter assault that the entire family sought to leave Indonesia. Ms. Lim applied for, and in August 2002 on her second attempt was granted, a non-immigrant visa to the United States. It was valid for three months. Her daughter's visa application

was rejected. The family decided that Ms. Lim should leave alone, and that the daughter should remain in Indonesia with her husband.

Ms. Lim left Indonesia and lawfully entered the United States on September 7, 2000. On Christmas Eve of that year there occurred bombings of Christian churches in Jakarta and elsewhere in Indonesia. Ms. Lim's husband again sought unsuccessfully to obtain the United States visas for himself and his daughter. The daughter continued to report to her mother that she had been exposed to incidents of harassment on her way to school.

Since her arrival in Philadelphia Ms. Lim has attended a Pentecostal Christian church and manages money for it as part of its treasury team. She has been working since December 2002, when she received employment authorization from the Immigration Service. Before that time she subsisted in the United States by cooking for friends and on money received from her parents and from her savings in Indonesia.

Ms. Lim was placed in removal proceedings by a notice to appear which charged her with being subject to removal for remaining in this country for longer than permitted. On June 15, 2003 Ms. Lim, through counsel, admitted the allegations of the Notice to Appear and conceded removability. On July 26, 2001, she applied for asylum, withholding of removal and protection under the CAT based on religious and ethnic persecution inflicted in Indonesia. On August 29, 2001, Ms. Lim's asylum case was referred to an IJ for adjudication on the merits.

Immigration Judge Malloy heard the merits of Ms. Lim's case on October 23, 2003. In her oral opinion issued that day the IJ referred to the 1965 incident when Ms. Lim was seven years old, stating: "There is sufficient evidence in the background materials to establish that there have been riots occurring in Indonesia periodically and that during these riots Chinese are sometimes and often targeted. However, the beginnings of these riots generally stem from political unrest or economic crises and during the riots many individuals, including Chinese, are harmed."

Referring to the May 13, 1998 looting and destruction of the restaurant, the IJ observed that "[t]here is ample evidence in the record to find that the respondent's description of Jakarta during May, 1998, is credible. That is, there is ample evidence to establish that major riots occurred in Jakarta during May of 1998." The IJ then addressed the underlying causes of the riots: "However, by respondent's own admission in her affidavits, the economy of Indonesia began to suffer in 1997 and all documentation indicate[s] that the riots of 1998 were the result of dissatisfaction among the Indonesian population with the economy of Indonesia[,] which is still faltering. During this period of time, the restaurant of respondent was destroyed." The IJ noted that a week later the Indonesian government dispersed the military to guard the Chinese communities within Jakarta.

The IJ commented that Ms. Lim and her daughter were never prevented from attending her church or participating in its activities, they continued to do so and the

8

church remains open. The IJ also observed that, even though Ms. Lim testified that she was identified as being Christian because of her ethnicity, not all Indonesians were Muslims, as there were Indonesian members of her church, and not all Chinese are Christians.

The IJ recounted that although "[t]he respondent has certainly been discriminated against [and] [t]here is enough information in the background materials to corroborate the respondent's testimony regarding discrimination against ethnic Chinese," she observed that a number of laws have been instituted that have changed many of the discriminatory practices against the Chinese. The IJ recited a number of these laws, stating "[n]o laws can prohibit biased, bigoted individuals from continuing the practice of discrimination. However, these forms of discrimination do not rise to the level of persecution. The Court acknowledges that there are still remnants of discrimination against the Chinese in Indonesia. However, these actions are not condoned by the Indonesian government."

At the heart of the IJ's ultimate decision in this case on Ms. Lim's claim of persecution on ethnic grounds is her observation that "[t]hese attacks on the Chinese are criminal acts. No government can protect its citizens from the actions of criminals. There is not one government in the entire world that can protect its citizens from the actions of criminals, including the United States. Yes, there is discrimination to a certain degree against the Chinese in Indonesia, and, yes, there have been crimes committed against the Chinese. However, again, these crimes do not rise to the level of

persecution...".

Turning to Ms. Lim's claim of persecution on account of her religion, the IJ stated that "the Court finds that the respondent is a Christian, that she attended a Christian church in Indonesia, and that she is currently a member of a Christian church here in Philadelphia." However, applying the same reasoning it applied to Ms. Lim's claim of ethnic persecution, the IJ held that Ms. Lim had not suffered past persecution on account of her religion. Referring to the events about which Ms. Lim testified, the IJ stated "these are not actions by the government of Indonesia. These are actions by biased individuals. Every country experiences individuals who will target groups of people for various reasons and governments cannot stop these practices completely."

Having found that Ms. Lim had not suffered from past persecution on account of ethnicity and/or religion, the IJ also found that '[t]he respondent in this case has not convinced the Court that she would be targeted should she return to Indonesia on account of her ethnicity or her religion. Therefore, she has failed to establish that she would suffer future persecution on account of her ethnicity or religion should she return to Indonesia."

The IJ further concluded that Ms. Lim failed to establish eligibility for withholding of removal or for relief under the CAT. The IJ granted voluntary departure in lieu of removal.

On appeal from the IJ's decision, the BIA on December 10, 2004 affirmed without

10

opinion.  This petition for review followed.

## II.  Jurisdiction and Standard of Review

Under 8 U.S.C. § 1252(a), we have jurisdiction to hear a petition for review from a final order of the BIA.  When the BIA affirms an IJ without opinion, "we review the IJ's opinion and scrutinize its reasoning."  Smriko v. Ashcroft, 387 F.3d 279, 282 (3d Cir. 2004) (internal quotation marks and citation omitted).  There is a de novo standard of review for issues that are questions of law.  Gerbier v. Holmes, 280 F.3d 297, 302 n.2 (3d Cir. 2002).  In asylum cases, we must uphold the agency's factual findings if they are supported by substantial evidence.  Singh-Kaur v. Ashcroft, 385 F.3d 293, 296 (3d Cir. 2004).  That is, the denial of asylum can be reversed "only if the evidence presented by [the Petitioner] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed."  INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992); see also Abdille v. Ashcroft, 242 F.3d 477, 483-84 (3d Cir. 2001) ("[T]he [agency]'s finding must be upheld unless the evidence not only supports a contrary conclusion, but compels it.").  Adverse credibility determinations, like other factual findings in immigration proceedings, are reviewed under the substantial evidence standard.  Mulanga v. Ashcroft, 349 F.3d 123, 131 (3d Cir. 2003).

## III.  Discussion

Under 8 U.S.C. § 1158(b)(1), the Attorney General may grant asylum to an alien who is a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42).  An applicant must

11

show that he or she

> is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of [the country of such person's nationality or in which such a person last habitually resided], because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . .,

8 U.S.C. § 1101(a)(42)(A). A showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1). Where the applicant has demonstrated past persecution "the Service shall bear the burden of establishing by a preponderance of the evidence" that the presumption of future persecution has been rebutted. 8 C.F.R. § 1208.13(b)(1)(ii). This presumption can be rebutted in two ways: i) "there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality . . ." or ii) "the applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . .". 8 C.F.R. § 1208.13(b)(1)(i)(A)-(B).

Ms. Lim challenges the IJ's finding that she did not suffer past persecution and her conclusion that she failed to establish a well-founded fear of future persecution. We conclude that, when determining whether Ms. Kim suffered past persecution or had a well-founded fear of future persecution, the IJ overlooked critical evidence. Her finding that the attacks upon Ms. Lim and her daughter were not "on account" of ethnicity or religion, but, rather, were on account of political unrest and/or bad economic conditions,

12

failed to take into account the conditions of Indonesia as described in the Country Reports and the events that Ms. Lim recounted.

Our recent opinion in Lie v. Ashcroft, 396 F.3d 530 (3d Cir. 2005), decided after the BIA's affirmance of the IJ's decision in the present case, is instructive in an analysis of the IJ's opinion, both for its similarities to the present case and for its significant differences. Lie and her husband, Indonesian citizens, were ethnically Chinese and Christian. Lie alleged that in 1997 several native Muslim Indonesians entered her husband's store, threatened him with a knife, called him a "Chinese pig" and then robbed him. Traumatized by the robbery, the husband left for the United States in December 1997. Ms. Lie also alleged that in July 1998 two people knocked on the door of her home, called her a "Chinese pig" and demanded entry. They knocked down the door, threatened to burn down her house, and demanded money. They took money and jewelry and cut her in the left forearm with a knife when she tried to defend herself. For the next twenty-one months Lie and her son continued to live in the same house without further incidents.

Lie and her son left Indonesia in March 2000, entering the United States as non-immigrant visitors. She acknowledged in her asylum proceedings that she came to the United States "to see if she wanted to settle here." She filed an asylum application with her husband and son as derivative applicants. The IJ found that the robberies of Lie and her husband were motivated at least in part by a desire to punish them because of their

13

ethnicity, finding support for this conclusion in evidence of the 1998 anti-Chinese riots. Having found past persecution, the IJ held that the presumption of future persecution had not been rebutted by evidence of changed conditions in Indonesia.

On appeal the BIA reversed. It found that "with regard to the single incident of abuse [Lie] has described, a robbery of her store, there was no evidence that it was motivated by her religion. As for her claim that the robbery was motivated by her Chinese ethnicity, the only evidence to support that claim was her testimony that her attackers said 'you Chinese pigs, I want your money,'" which the BIA found to be insufficient. Further, the BIA held that the robbery incident did not constitute persecution and that Lie lacked a well-founded fear of future persecution.

Our court affirmed the BIA, but the reasoning of our decision leads to a different result in this case.

The first question we addressed in Lie was whether there was substantial evidence to support the BIA's finding that the robberies of the Lies were not on account of their ethnicity or religion but were simply every day robberies. A single ethnic slur was found insufficient in light of the strong evidence that the attackers were motivated simply by money: the attackers fled after stealing Lie's jewels and money; her Chinese neighbors were not robbed; and Lie and her son lived in peace for almost two years following the attack.

In the present case the IJ in reaching her decision virtually ignored the

14

overwhelming evidence that the attacks upon Ms. Lim were on account of her ethnicity and religion. Instead she relied upon the underlying causes of the attacks as a reason for her finding that Ms. Lim had not been persecuted on account of her ethnicity or religion. Referring to the time when Ms. Lim as a child was hidden under her bed as Indonesians sought her father to kill him and stoned her house, the IJ stated that "the beginnings of these riots generally stem from political unrest or economic crises and during the riots many individuals, including Chinese, are harmed." Referring to the 1998 riots, the IJ wrote that "the economy of Indonesia began to suffer in 1997 and all documentation indicate[s] that the riots of 1998 were the result of dissatisfaction among the Indonesian population with the economy of Indonesia[,] which is still faltering."

Rather than relying upon Ms. Lim's unrebutted testimony and the Country Reports which demonstrated beyond dispute that the attacks upon Ms. Lim were on account of her ethnicity and, in the case of the 2000 episode, her ethnicity and religion, the IJ relied on the underlying political and economic factors as the cause of these attacks. This is what we warned against doing in Lie.

> We have recognized that "[a] persecutor may have multiple motivations for his or her conduct, but the persecutor must be motivated, at least in part, by one of the enumerated grounds." Lukwago v. Ashcroft, 329 F.3d 157, 170 (3d Cir. 2003); see also Chang v. INS, 119 F.3d 1055, 1065 (3d Cir. 1997) (finding persecution on account of political opinion where persecutor's action was "motivated, at least in part" by the applicant's political opinion).

396 F.3d at 535.

Unlike the situation in Lie, in our case the evidence discloses three serious attacks

15

upon Ms. Lim which can only have been on account of her ethnicity and/or religion. We describe above general conditions in the country, the 1965 attack upon Ms. Lim's house, the 1997 and 1998 racial riots during which Ms. Lim was attacked in her restaurant, and the Easter attack on Ms. Lim and her daughter that occurred in 2000. None of these events were isolated robberies or other purely criminal acts.

Unlike Lie, Ms. Lim did not wait almost two years to leave the country. In 1996, 1997, and 2000 she and her husband went to Singapore to determine if they could relocate there. Shortly after the Easter 2000 episode Ms. Lim and the rest of her family began their efforts to obtain visas to travel to the United States. Her husband and daughter were unsuccessful, but Ms. Lim succeeded in entering the United States on September 7, 2000.

The IJ's conclusion that the attacks on Ms. Lim were not on account of her ethnicity and/or religion because the emotions of the people who attacked her were whipped up by political and economic conditions overlooks the evidence that ethnicity and religion played a major role in the attacks upon Ms. Lim.

In our case the IJ found that the acts about which Ms. Lim complained constituted mere discrimination against Ms. Lim and that "these forms of discrimination do not rise to the level of persecution." The IJ recited that "[n]ew laws have been enacted which now permit universities to teach Chinese languages. Chinese cultural holidays are now celebrated openly. The laws banning the recognition of cultural holidays for the ethnic Chinese have been abolished. Chinese are now permitted to celebrate cultural holidays.

16

They are permitted to study Chinese languages in school. They are permitted to obtain periodicals in the Chinese language[s]. They are no longer required to identify themselves as ethnic Chinese on the national ID cards." The IJ observed that "[n]o laws can prohibit biased, bigoted individuals from continuing the practice of discrimination. However, these forms of discrimination do not rise to the level of persecution."

However, Ms. Lim was not complaining about universities being unable to teach Chinese languages, or being unable to celebrate Chinese cultural holidays, or being unable to obtain periodicals in the Chinese language. Ms. Lim set forth in considerable detail the assaults upon her and her family, assaults that the IJ failed to take into account when she held that the events that Ms. Lim recounted did not rise to the level of past persecution or fear of future persecution. The case must be remanded so that this critical evidence will enter into the determination whether, upon application of the standard announced in Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir. 1993), Ms. Lim has established past persecution of fear or future persecution[2].

### III. Conclusion

Although in asylum cases we must uphold the agency's factual findings if they are

_____

[2] In Lie, after holding that the BIA found correctly that Lie had failed to establish past persecution, we further agreed with the BIA's finding that Lie failed to establish a well-founded fear of future persecution if she were to return to Indonesia. Lie was not entitled to the regulatory presumption in that case. Absent that presumption, Lie had failed to demonstrate that she had a subjective fear of persecution and had failed to establish the objective prong of the well-founded fear test because she failed to establish an individualized risk of persecution or that there is a pattern or practice of persecution of Chinese Christians in Indonesia.

17

supported by substantial evidence, in the present case we conclude that the IJ's finding that Ms. Lim failed to establish past persecution or fear of future persecution must be reversed because it failed to take into account critical undisputed evidence.

The BIA erred in affirming the IJ's decision. We remand the case to the BIA with instructions to remand it to the IJ for reconsideration of her decision and a ruling on Ms. Lim's asylum and withholding of removal claims.