

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-10-2006

# McAllister v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-4513

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"McAllister v. Atty Gen USA" (2006). *2006 Decisions.* Paper 1185.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1185

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 03-4513/04-3695

MALACHY MCALLISTER; *MARK J. MCALLISTER;
SARAH B. MCALLISTER; PAUL GARY MCALLISTER;
NICOLA MCALLISTER; SEAN R. MCALLISTER,

Petitioners in 03-4513

v.

Attorney General of the United States,

Respondent.

*Dismissed Pursuant to Court's Order dated 1/13/04

NICOLA MCALLISTER
SEAN R. MCALLISTER,

Petitioners in 04-3649

v.

Attorney General of the United States

Petition for Review of an Order of the
Board of Immigration Appeals

(Agency Nos. A73-629-577; A73-551-831; A73-551-832;
A73-551-833; A73-551-834; A73-551-835)

———————————

Argued on June 29, 2005

BEFORE:  ROTH, RENDELL and BARRY, <u>Circuit Judges</u>

( Filed: April 10, 2006 )

Eamonn S. Dornan, Esquire (ARGUED)
Smith, Dornan & Dehn, P.C.
110 East 42nd Street, Suite 1303
New York, NY   10017

        Counsel for Petitioners

Peter D. Keisler, Esquire
Assistant Attorney General
Michael P. Lindemann, Esquire
Assistant Director
John M. McAdams, Jr., Esquire (ARGUED)
Douglas E. Ginsburg, Esquire
Office of Immigration Litigation
Civil Division
United States Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C.   20044

        Counsel for Respondent

**ROTH**, Circuit Judge:

We review here two decisions of the Board of Immigration Appeals (BIA). In the first, the BIA found that Malachy McAllister (Malachy) was removable because he had engaged in terrorist activities. *See* 8 U.S.C. § 1227(a)(4)(B). The BIA also denied all of Malachy's requests for relief from removal. In the second, the BIA found that Malachy's wife, Sarah McAllister (Sarah), and their four children, Nicola, Sean, Mark and Paul Gary, were removable because they had overstayed their visas.[1] *See* 8 U.S.C. § 1227(a)(1)(B). The BIA granted Sarah and the children voluntary departure but denied all other relief from removal.

## I. Facts

The McAllisters are natives and citizens of Northern Ireland in the United Kingdom. In the early 1980s, Malachy became involved with the Irish National Liberation Army (INLA). In 1981, as a member of the INLA, Malachy participated in two incidents. First, he acted as an armed look-out while other members of the INLA used firearms to shoot a Royal Ulster Constabulary (RUC) officer. Second, he acted as a member of a conspiracy to shoot and kill a RUC officer. For these actions, Malachy was ultimately convicted of "unlawful and malicious wounding with intent to do grievous bodily harm" and "conspiring to murder." He was sentenced to seven years incarceration for these offenses. On September 30, 1985, Malachy received an early release from prison for good

---

[1] This appeal does not involve Mark.

behavior.

On December 15, 1988, Malachy, Sarah and their children left Northern Ireland for Canada. The family fled Northern Ireland following vicious attacks by Loyalist forces and the RUC. For example, Loyalist paramilitaries raked the family home with gunfire and the RUC threw Sarah out of a moving vehicle while she was pregnant. Malachy applied for asylum in Canada but it was denied and he was ordered deported. On March 6, 1996, Malachy and his family entered the United States as nonimmigrant visitors for pleasure. On March 5, 1999, the Immigration and Naturalization Service (INS) instituted removal proceedings against each member of the McAllister family. Malachy filed an application requesting asylum, withholding of removal, and withholding of removal under the Convention Against Torture (CAT). Sarah filed a similar application, with each of her children as a derivative applicant.

## II. Procedural History

On October 11, 2000, an Immigration Judge (IJ) found that each member of the McAllister family was removable. The IJ denied all of Malachy's requested relief but granted asylum to Sarah and the children. Malachy filed a timely appeal. The Office of Immigration Litigation (OIL)[2] appealed the IJ decision concerning Sarah and the children. On November 17, 2003, the BIA issued two final orders of removal. In the first order, the BIA affirmed the IJ's determination that Malachy was removable on the grounds that he had engaged in terrorist

---

[2] On March 1, 2003, the INS was eliminated as an agency under the Department of Justice. The functions for which INS was responsible were transferred to the Department of Homeland Security and, as regards the proceedings in this case, to OIL. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002).

activities. *See* 8 U.S.C. § 1227(a)(4)(B). The BIA also affirmed the IJ's denial to him of relief from removal. In the second order, the BIA affirmed the IJ's determination that Sarah and the children were removable for overstaying their visas. The BIA, however, reversed the IJ's grant of asylum to Sarah and the children and denied all their other requests for relief, except for voluntary departure. The McAllisters appealed and their appeals were consolidated.

On May 10, 2004, Sarah died of cancer. On July 1, 2004, Nicola and Sean filed a Motion to Reopen the November 17, 2003, Order of the BIA so that they could independently file applications for asylum and for relief under CAT. On August 3, 2004, the BIA denied their motion because it was not timely filed.[3] *See* 8 U.S.C. § 1229a(c)(7)(C); 8 C.F.R. § 1003.2(c)(2). On September 16, 2004, Nicola and Sean filed a petition for review of the BIA's decision.

## III. Jurisdiction

### A. Malachy

We have jurisdiction to review final orders of removal. *See* 8 U.S.C. § 1252(a)(1). There are, however, certain situations in which our jurisdiction to review final orders of removal is limited or eliminated. *See* 8 U.S.C. §§ 1252(a)(2)(A)-(C), 1158(b)(2)(D). If the issues presented in a petition for review of a final order involve constitutional claims or questions of law, our jurisdiction is never limited or

---

[3] The BIA's decision also found that Nicola and Sean's motion did not meet any of the exceptions to the timeliness requirement. *See* 8 U.S.C. § 1229a(c)(7)(C)(ii); 8 C.F.R. § 1003.2(c)(3)(ii).

eliminated. *See* 8 U.S.C. § 1252(a)(2)(D).[4] On the other hand, if an alien is removable for having committed one of the offenses enumerated in 8 U.S.C. § 1252(a)(2)(C),[5] we lack

---

[4] On May 11, 2005, the President signed into law the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (2005). The REAL ID Act amended the INA and provided that the courts of appeals shall have jurisdiction to review all final orders of removal that raise constitutional claims and questions of law.

[5] 8 U.S.C. 1252(a)(2)(C) **Orders against criminal aliens**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code [28 USCS § 2241], or any other habeas corpus provision, and sections 1361 and 1651 of such title [28 USCS §§ 1361 and 1651], and except as provided in subparagraph (D), no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 212(a)(2) or 237(a)(2)(A)(iii), (B), (C), or (D) [crimes of moral turpitude, violation of laws relating to controlled substances, conviction of 2 or more offenses with aggregate sentences of confinement of 5 years of more, involvement in drug trafficking, involvement in prostitution and other unlawful commercialized vice, immunization from prosecution for a crime committed in the U.S., severe violations of religious freedom by foreign government officials, significant trafficking in persons, money laundering, and other enumerated offenses.], or any offense covered by section 237(a)(2)(A)(ii) [multiple criminal convictions] for which both predicate offenses are, without regard to their date

jurisdiction to review a final order of removal that does not raise constitutional claims or questions of law. *See* 8 U.S.C. § 1252(a)(2)(C)-(D).

In the present case, the BIA did not specifically find that Malachy was removable for having committed one of the offenses enumerated in subsection (C). Rather, the BIA found Malachy removable based on his engagement in terrorist activities. *See* 8 U.S.C. § 1227(a)(4)(B).[6] Thus, whether subsection (C) limits our jurisdiction depends on whether the jurisdictional bar of subsection (C) requires the final order of removal to be based on one of subsection (C)'s enumerated offenses. We address this issue as one of first impression for our Court.

Our sister circuits have addressed the application of the jurisdictional bar of subsection (C), and of similar jurisdictional provisions, *e.g.*, § 440(a) of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), and § 309(c)(4)(G) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009 (1996), *amended by* the Act of Oct. 11, 1996, Pub. L. No. 104-302, 110 Stat. 3656 (1996). Some courts have held that the final order of removal does not need to be grounded in one of the enumerated offenses for the jurisdictional bar to apply. *See Fernandez-Bernal v. Attorney General*, 257 F.3d 1304, 1310 (11th Cir. 2001) (holding that

---

of commission, otherwise covered by section 237(a)(2)(A)(i) [moral turpitude].

[6] 8 U.S.C. § 1227(a)(4)(B) **Terrorist activities**
Any alien who is described in subparagraph (B) or (F) of section 212(a)(3) [8 USCS § 1182(a)(3)] is deportable.

jurisdictional bar of subsection (C) is not dependent upon the grounds of removal being based on one of the enumerated offenses); *Lopez-Elias v. Reno*, 209 F.3d 788, 793 (5th Cir. 2000) (same); *Abdel-Razek v. INS*, 114 F.3d 831, 832 (9th Cir. 1997) (holding that jurisdictional bar of AEDPA § 440(a) is not dependent upon the final order of removal referring to one of the provision's enumerated offenses) Other courts, however, have required the final order of removal to be based on one of the enumerated offenses. *See Yousefi v. INS*, 260 F.3d 318, 325 (4th Cir. 2001) (requiring a deportation order to be based on an offense enumerated in § 309(c)(4)(G) for that provision's jurisdictional bar to apply); *Xiong v. INS*, 173 F.3d 601, 608 (7th Cir. 1999) (prohibiting the INS from arguing that the alien committed an enumerated offense on appeal in support of a jurisdictional bar because the final order of removal was based on an unenumerated offense); *Choeum v. INS*, 129 F.3d 29, 39 (1st Cir. 1997) (finding it doubtful that Congress intended "deportable for reason of" in AEDPA § 440(a) to be the equivalent of "potentially susceptible to being deported by reason of").

We conclude that Congress intended that the clear language of the statute be utilized. Thus, we read the jurisdictional bar of subsection (C) to apply when the *actual basis* for the final order of removal was the alien's commission of one of the enumerated offenses. *See Yousefi*, 260 F.3d at 325. *See also Xiong*, 173 F.3d at 608; *Choeum*, 129 F.3d at 39. We are convinced that the approach taken by the First, Fourth and Seventh Circuits with regard to the jurisdictional bar for review of final orders of removal is the proper approach. We hold that for purposes of the jurisdictional bar found in 8 U.S.C. § 1252(a)(2)(C), an alien is not "removable for reason of having committed [an enumerated] criminal offense" *unless* the final order of removal is grounded, at least in part, on one of those enumerated offenses.

In this case, the BIA found Malachy removable because he engaged in terrorist activities, which is not an offense enumerated in subsection (C). Therefore, subsection (C) does not limit our jurisdiction to review the BIA's final order of removal, and we will give full review to his petition.

## B. Sarah

When a case or controversy ceases to exist between two parties, the case is rendered moot. *See* U.S. CONST. art. III, § 2; *Spencer v. Kemna*, 523 U.S. 1 (1998). When an alien dies with her case pending before the court of appeals, the court of appeals can no longer grant the relief that the alien seeks. The case or controversy ceases to exist, rendering the alien's claim moot. In this case, Sarah died on May 10, 2004, while her case was pending before us. Her death rendered her claims moot and we will dismiss her petition. *See Spencer v. Kemna*, 523 U.S. 1, 18 (1998).

## C. Nicola and Sean

Nicola and Sean were derivative applicants on Sarah's applications for relief from removal. As derivative applicants, they relied on Sarah's application for relief. *See* 8 U.S.C. § 1153(d). When Sarah's claim became moot, Nicola and Sean were left without the principal alien upon whose application their own status rested. On July 1, 2004, Nicola and Sean filed a motion to reopen their case in order to file independent applications for relief based on the events that were the subject of Sarah's original application as well as on an assertion that a cousin in Northern Ireland had been attacked and beaten by a gang of Loyalists. On August 3, 2004, the BIA denied the motion to reopen on the basis that it was filed more than 90 days after the November 17, 2003, order of the BIA, denying them asylum. The BIA further held that the motion to reopen did not fall within any of the exceptions to the timely filing of motions to reopen because Nicola and Sean had not demonstrated *prima*

-9-

*facie* eligibility for asylum. *See* 8 U.S.C. § 1229a(c)(7)(C)(ii).

On September 16, 2004, Nicola and Sean filed a petition for review of the BIA's denial. Because the petition for review was filed more than thirty days after the BIA's August 4, 2004, final order, the petition was untimely. Thus, we lack jurisdiction to review this decision by the BIA, and we will dismiss Nicola and Sean's appeals. *See* 8 U.S.C. § 1252(b)(1). *See also Navarro-Miranda v. Ashcroft*, 330 F.3d 672, 676 (5th Cir. 2003) (applying the thirty-day deadline of § 1252(b)(1) to a petition for review of a motion to reopen).

### D. Paul Gary

On March 17, 2004, the BIA remanded Paul Gary's case to the Immigration Court so that he could apply for adjustment of status. Pursuant to 8 U.S.C. § 1252(d)(1), we no longer have jurisdiction to review his claims. Therefore, we will dismiss Paul Gary's claim for lack of jurisdiction.

## IV. Standard of Review

We now turn to the substance of Malachy's petition. We review the BIA's findings of fact to determine whether substantial evidence supports them. *See Singh-Kaur v. Ashcroft*, 385 F.3d 293, 296 (3d Cir. 2004). We will only reverse the BIA's findings "if the evidence compels a contrary conclusion." *Ahmed v. Ashcroft*, 341 F.3d 214, 216 (3d Cir. 2003) (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)). We give *de novo* review to constitutional claims. *See Chong v. District Director, INS*, 264 F.3d 378, 386 (3d Cir. 2001). We review the BIA's interpretation of the INA to determine whether it is "arbitrary, capricious or manifestly contrary to the statute." *See Ahmed*, 341 F.3d at 217 (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)).

With respect to the denial of a motion to reopen,[7] we apply the abuse of discretion standard. *See Borges v. Gonzalez*, 402 F.3d 398, 404 (3d Cir. 2005). The BIA's denial of a motion to reopen will not be disturbed unless it is "arbitrary, irrational, or contrary to law." *Guo v. Ashcroft*, 386 F.3d 556, 562 (3d Cir. 2004) (quoting *Tipu v. INS*, 20 F.3d 580, 582 (3d Cir. 1994)).

## V. Analysis

### A. Removal

Malachy challenges the BIA's determination that he is removable, claiming that he did not engage in "terrorist activities." Malachy asserts four grounds to support his contentions of error. First, he argues that the INA's definition of "terrorist activity" is unconstitutionally overbroad because it encompasses common crimes that no reasonable person would consider to be terrorist acts. Second, he claims that the BIA failed to find that he was a member of a terrorist organization. Third, he asserts that he did not target non-combatants. Finally, he contends that the situation in Northern Ireland had risen to the level of an Article 3 conflict under the Geneva Convention so that his conduct could not be considered a terrorist activity. In the alternative, Malachy claims that the INA's "political offense" exception applies in this case, and therefore the BIA's determination that he was removable is erroneous.

### 1. Engaging in Terrorist Activity

---

[7] For purposes of jurisdiction and standard of review, motions to remand and motions to reopen are treated the same. *See Korytnyuk v. Ashcroft*, 396 F.3d 272, 282 & n.15 (3d Cir. 2005).

### a. "Terrorist Activity"

Malachy asserts that the definition of "terrorist activity" in 8 U.S.C. § 1182(a)(3)(B)(iii)(V)(b) is unconstitutionally overbroad. We note that Malachy's argument also raises issues of vagueness, which is similar to the doctrine of overbreadth. *Waterman v. Farmer*, 183 F.3d 208, 212 n.4 (3d Cir. 1999). As such, we will examine both doctrines.

A statute is unconstitutionally vague if "men of common intelligence must necessarily guess at its meaning and differ as to its application." *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). A statute is unconstitutionally overbroad if it "does not aim specifically at the evils within the allowable area of control [by the government] but . . . sweeps within its ambit other [constitutionally protected] activities." *Id.* at 212 n.5 (quoting *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940)).

Clause (iii) of 8 U.S.C. § 1182(a)(3)(B) states, in relevant part, that "terrorist activity" is:

> any activity which is unlawful . . . which involves . . . [using an] explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

8 U.S.C. § 1182(a)(3)(B)(iii)(V)(b). While this definition is certainly broad, we conclude that it is neither vague nor overbroad in that it does not infringe on constitutionally protected behavior. The definition includes a great deal of conduct, but all of this conduct could reasonably constitute

-12-

terrorist activities.

First, the parenthetical phrase "other than for mere personal monetary gain" removes common crimes from the definition by requiring that the offending activity be conducted for reasons other than money. For that reason, offenses like robbery and burglary are not included in the definition. Second, the *mens rea* element of the provision requires the actor to have the specific intent to endanger the safety of individuals or to cause substantial damage to property. Thus, the definition of terrorist activity does not include situations in which an alien has acted in self-defense[8] or in which the alien lacks the capacity[9] to meet the requisite intent. More importantly, none of the aforementioned activities constitute a protected activity outside of the permissible bounds of Congressional regulation.

In support of his position, Malachy provided three hypothetical examples of conduct that he claims would unconstitutionally fall under the statutory definition of "terrorist activity." The examples are "an 8-year-old child who brings a baseball bat to school to protect himself from bullies; an individual institutionalized for a mental health disorder who attacks a doctor; [and] a woman who protects herself, in the course of a domestic violence attack, with standard kitchen cooking utensils." Our examination of the conduct involved in these three hypotheticals convinces us, however, that none of them would constitute "terrorist activity" under the definition because none of them satisfies the elements of the definition nor are the characters engaging in protected activity. For example, both the little boy and the battered wife have acted in self-defense, which negates the "unlawful" element. The institutionalized individual *in all likelihood* does not have the

---

[8] *See* 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 10.4(a) (2d ed. 2003 & Supp. 2005).

[9] *See* 1 LAFAVE *supra* § 7.1.

legal capacity to satisfy the intent requirement under the common law. *See* 1 LAFAVE *supra* § 7.1. Although we concede that the INA's definition of "terrorist activity"certainly encompasses more conduct than our society, and perhaps even Congress, has come to associate with traditional acts of terrorism, *e.g.*, car bombs and assassinations, nevertheless, we conclude that the INA's definition of "terrorist activity" found in 8 U.S.C. § 1182(a)(3)(B)(iii)(V)(b), is neither unconstitutionally overbroad nor vague.

### b. Member of a "Terrorist Organization"

Malachy next contends that the BIA erred when it found that he had engaged in terrorist activities because the BIA did not at the same time find that he was a member of a terrorist organization. To be engaged in a terrorist activity, the INA requires an alien to act either "in an individual capacity or as a member of *an* organization." 8 U.S.C. § 1182(a)(3)(B)(iv) (emphasis added). The statute does not qualify the term "organization." Terms and provisions may not be added to a statute where Congress has omitted them. *See Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 168 n.16 (1993). Therefore, the BIA must find that an alien acted on his own or as a member of *an* organization – not just a terrorist organization – before it determines that the alien engaged in "terrorist activity."

In this case, it is undisputed that Malachy acted as a member of the Irish National Liberation Army (INLA) and not as an individual. The INLA is not a terrorist organization as the INA defines that term. *See* 8 U.S.C. § 1182(a)(3)(B)(vi). Because the INA does not expressly require the organization, with which the alien was acting, to be a *terrorist* organization, we accept as reasonable the BIA's construction of 8 U.S.C.§ 1182(a)(3)(B)(iv): an alien must be acting either individually or as a member of *an* organization – but not necessarily as a

-14-

member of a *terrorist* organization.[10]

### c. Targeting Non-Combatants and Article 3 Conflict

Malachy claims that the BIA erred in finding that he engaged in terrorist activities because, at the time he engaged in the conduct, he did not target non-combatants and the situation in Northern Ireland had risen to the level of an Article 3 conflict under the Geneva Convention. The issue we must now consider is whether the BIA must weigh such factors in making the determination that an alien has engaged in terrorist activities.

The BIA did not consider whether Malachy had targeted non-combatants and did not consider whether the situation in Northern Ireland had risen to the level of a Geneva Convention Article 3 conflict. The INA's definition of engaging in terrorist activity does not address either the targeting of non-combatants or the levels of conflict under the Geneva Convention. Consequently, Malachy's proffered distinctions between combatant and non-combatant and Article 3 verses non-Article 3 conflict are not sustainable, and the BIA did not err.[11]

---

[10] We also note that even if 8 U.S.C. § 1182(a)(3)(B)(iv) were not clear on its face, for us to interpret the provision to mean that the offending conduct must have been committed in one's individual capacity or as a member of a *terrorist* organization would leave a gaping hole in the statute that Congress could not have intended. The result of such an interpretation would be that conduct identical to that which the statute calls "engaging in terrorist activity" would not be such if the alien chose to act as a member of an organization that the INA does not define as a "terrorist organization." To interpret the statute in this manner would be unreasonable.

[11] Even if the INA were ambiguous on this point, we are reluctant to find that the BIA's interpretation of "terrorist

## 2. "Political Offense" Exception

In the alternative, Malachy claims that, even if he has engaged in terrorist activities, the BIA erred when it found him removable because the "political offense" exception to the INA applies to his conduct. "Political offenses" is a "designation of a class of crimes usually excepted from extradition treaties, this term denotes crimes which are incidental to and form a part of political disturbances." Black's Law Dictionary 1158 (6th ed. 1990). The "political offense" exception appears three times in the text of the INA. *See* 8 U.S.C. §§ 1101(a)(43)(F), 1182(a)(2)(A)(i)(I), and 1182(a)(2)(B). None of the provisions that contain the "political offense" exception applies in this case. Section 1101(a)(43) defines the term "aggravated felony." Section 1182(a)(2)(A)(i)(I) deals with aliens who have been convicted of a crime involving moral turpitude. Section 1182(a)(2)(B) deals with aliens who have committed two or more offenses with an aggregate time of incarceration that is five years or more. In this case, the BIA found Malachy removable because he engaged in terrorist activities. None of the provisions containing the term "political offense" pertain to or refer to provisions involving terrorist activities. The BIA determined that the "political offense" exception was a limited exception that applied only to the specific subsections in which it was found and thus did not apply to terrorist activities. We conclude that this interpretation of the "political offense" exception was reasonable. *See Chevron*, 467 U.S. at 843; *Abdulai*, 239 F.3d at 552.

### B. Asylum

---

activity" is unreasonable or that it was necessary to include these factors in its analysis. *See Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984); *Abdulai v. Ashcroft*, 239 F.3d 542, 552 (3d Cir. 2001) (quoting *Chevron*).

-16-

In addition to challenging his removal order, Malachy contends that the BIA erred when it found that he was ineligible for asylum. He asserts that to be found ineligible for asylum, the BIA must find that he has engaged in terrorist activities *and* that he is a danger to the security of the United States. He claims that the BIA found only the former. Whether the INA requires the BIA to make both findings is a question of law.

According to Malachy, "[t]he statute imposes a two-part analysis: (1) whether an alien engaged in a terrorist activity and (2) whether there are reasonable grounds to believe that the alien is a danger to the security of the United States." *Cheema v. INS*, 350 F.3d 1035, 1041 (9th Cir. 2003), *superceded on other grounds by* 383 F.3d 848 (9th Cir. 2004). We disagree with Malachy for two reasons. First, under the clear language of the statute, an alien is not eligible for asylum if the Attorney General determines "there are reasonable grounds for regarding the alien as a danger to the security of the United States," *or* that "the alien is described in . . . section 1227(a)(4)(B) of [Title 8] (relating to terrorist activity)." 8 U.S.C. § 1158(b)(2)(A)(iv)-(v). In this case, the BIA affirmed the IJ's determination that Malachy was removable under 8 U.S.C. § 1227(a)(4)(B). For that reason, under the express language of the statute, Malachy was not eligible for asylum.

Second, Malachy inappropriately relies on *Cheema*. The Ninth Circuit limited the *Cheema* ruling to cases in which the application for asylum was filed prior to April 1, 1997, because the *Cheema* decision was based on a version of the asylum statute that preceded IIRIRA. IIRIRA eliminated the application of the *Cheema* two-part analysis on all asylum applications filed after April 1, 1997. In this case, Malachy filed his application for asylum after March 5, 1999. Therefore, the *Cheema* two-part analysis does not apply.

Under the applicable version of the INA, an alien is ineligible for asylum if the Attorney General determines that the alien has engaged in terrorist activities. *See* 8 U.S.C. § 1158(b)(2)(A)(v). The BIA properly interpreted the statute in determining that Malachy was not eligible for asylum because he had engaged in terrorist activities. Thus, we will affirm the BIA's determination that Malachy is not eligible for asylum.

## C. Withholding of Removal

Malachy also claims that the BIA erred when it determined that he was not eligible for withholding of removal under the INA. He claims that the BIA should have done more than rely on its determination that he engaged in terrorist activities. Under the INA, an alien is ineligible for withholding of removal when the Attorney General decides that the alien is a danger to the security of the United States. *See* 8 U.S.C. § 1231(b)(3)(B)(iv). The statute specifically provides that, where the Attorney General has determined that an alien has engaged in terrorist activities, "there are reasonable grounds for regarding [that alien] as a danger to the security of the United States." 8 U.S.C. § 1231(b)(3)(B). Therefore, under the express language of the statute, Malachy was ineligible for withholding of removal. The BIA's determination to this effect cannot be considered unreasonable. Thus, we will affirm the BIA's

determination that Malachy is ineligible for withholding of removal under the INA.

## D. Deferral of Removal

Malachy contends that the BIA erred when it found that he had failed to establish a *prima facie* case for deferral of removal. To establish a *prima facie* case for deferral, an alien must establish that it is more likely than not that he will be tortured in the country of removal. *See* 8 C.F.R. § 208.16(c)(2). In its assessment of whether an alien will likely be tortured in

the country of removal, the BIA must consider "all evidence relevant to the possibility of future torture, including "information regarding conditions in the country of removal." 8 C.F.R. § 208.16(c)(3). In this case, the BIA relied heavily on the Department of State's *Country Report on Human Rights and Practices*, as it pertained to the conditions in Northern Ireland and the United Kingdom. Based on the Country Report, the BIA found that Catholic nationalists, conservatives, and IRA supporters and former IRA members (even those who were convicted and sentenced for terrorist offenses) were able to "freely go about their lives," "hold prominent positions in business, government, education and other walks of life," and "participate openly in the political process and [] hold public office." The Country Report has been called the "'most appropriate and perhaps the best resource' for 'information on political situations in foreign nations.'" *Kazlauskas v. INS*, 46 F.3d 902, 906 (9th Cir. 1995) (quoting *Rojas v. INS*, 937 F.2d 186, 190 n.1 (5th Cir. 1991)). Thus, there was ample basis for the BIA's determination that the United Kingdom was not a place where members of Malachy's race, religion, or political affiliations were being tortured.

The BIA also pointed to other evidence that demonstrated progress towards peace in Northern Ireland, including the devolution of power from the British Parliament to the Northern Ireland Assembly, a reduction in the deployment of British military troops in Northern Ireland, and evidence that paramilitary organizations are abiding by the cease-fire, pursuant to the Good Friday Agreement.[12] The BIA found that

---

[12] The Good Friday Agreement was an agreement between the major political parties of Northern Ireland, setting forth new constitutional arrangements for Northern Ireland. The agreement was entered on April 10, 1998, and provided that whether Northern Ireland would remain part of the United Kingdom would be decided by a majority of Northern Ireland voters. Seventy-one percent of Northern Ireland voters

Malachy had failed to establish that either the government of Northern Ireland or the government of the United Kingdom would torture him. The BIA held that the record does not support the finding that Malachy would more likely than not be detained and, if detained, that he would more likely than not be tortured and, if tortured, that it would more likely than not be with the acquiescence of the government to such torture.

The only new evidence that Malachy presents in support of his argument that he is more likely than not to be tortured in Northern Ireland, is the District Court opinion regarding his son, Mark. *See McAllister v. Ashcroft*, No. 04-0181 (D.N.J. July 21, 2004). Our review, however, is limited to the administrative record of this case. *See* 8 U.S.C. § 1252(b)(4)(A). The District Court opinion that Malachy asks us to consider is not part of the administrative record here and is therefore beyond the scope of our review. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). Based on the evidence *in* the administrative record and because Malachy has failed to introduce any new evidence that we may consider, we are not compelled to come to a conclusion that is contrary to that of the BIA. We will affirm

the BIA's holding that Malachy failed to establish a *prima facie* case for deferral of removal.[13]

--------------------------------------------------------

approved the agreement.

[13] We also note that Malachy's claim is that he will be tortured if he is returned to *Northern Ireland*. Malachy, however, is being removed to the United Kingdom. As the federal regulations make clear, "[e]vidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured" must be considered. We see no reason why Malachy and his family may choose not to return to Northern Ireland but to go instead to some other part of the United Kingdom.

-20-

### E. Motion to Remand

Finally, Malachy asserts that the BIA erred when it denied his Motion to Remand for a new hearing on his request for deferral of removal. He argues that he is able to present new evidence that challenges the evidence on which the BIA relied. In this case, the BIA determined that Malachy had failed to establish a *prima facie* case for deferral of removal. The BIA recognized that Malachy presented new evidence but held that the evidence was insufficient to overcome the BIA's conclusion concerning conditions in Northern Ireland. The BIA stated that a showing of past collusion between the British government and loyalist forces in Northern Ireland does not demonstrate that such collusion still exists or that there is an on-going threat to Malachy's safety. The BIA's reasoning in this regard is neither arbitrary or capricious. We, therefore, hold that the BIA did not abuse its discretion when it denied Malachy's motion.

## VI. Conclusion

For the reasons stated above, we will deny Malachy McAllister's petition to review the BIA's determination that Malachy is removable for having engaged in terrorist activities and to review BIA's denial of asylum, withholding of removal, deferral of removal, and remand.

We will dismiss the petitions for review of Sarah, Paul Gary, Nicola, and Sean McAllister for lack of jurisdiction.

Barry, Circuit Judge, concurring

I refuse to believe that "Give me your tired, your poor, your huddled masses yearning to breathe free . . ." is now an empty entreaty. But if it is, shame on us.

I concede. I cannot find a way to keep the McAllisters in this country, and I have surely tried. But the laws Congress has enacted, particularly those enacted in the wake of the September 11th horror, are bullet-proof, designed, as they should be, to combat terrorism. The problem here, though, is that Congress's definition of "terrorist activity" sweeps in not only the big guy, but also the little guy who poses no risk to anyone. It sweeps in Malachy McAllister.

Malachy's children, Sean and Nicola, are swept in, too, albeit in a very different way, as victims of the "gotcha" defense – they presented too little, too late, after their mother, Sarah, died of cancer a mere six weeks after diagnosis and her successful asylum application, on which they had been dependent, became moot. The Immigration Judge had granted asylum to Sarah and her children in a sixty-five page opinion issued after twelve trial days during which he heard sixteen witnesses, one of the most impressive opinions I have read in my years on the federal bench. He found such "overwhelming evidence of severe past persecution" suffered by Sarah because of her religion, her political opinion, and because she was Malachy's wife, that, without more, she and her children should not be forced to go back to the United Kingdom.

But, in a mere four pages, the Board of Immigration Appeals threw out that grant of asylum, concluding with utterly no discussion that no event or combination of events rose to the level of past persecution and that, regardless, there was little chance of future persecution in the United Kingdom. I simply cannot understand how the Board can have given such short shrift to the Immigration Judge's extensive compilation and discussion of the innumerable acts of persecution, including "the most striking and blatant act" that occurred on a Sunday evening in 1985 when twelve-year-old Paul, two-year-old Nicola, and one-year-old Sean survived twenty-six shots fired into their home by masked gunmen "intending to kill the entire family." Nevertheless, because the children had to file individual applications upon their mother's death, applications that were denied and then appealed to us two weeks too late, we have no power to stop their return to a country they left when they were little more than babies. Gotcha.

Malachy, a Nationalist Catholic, concededly committed two criminal acts in Belfast twenty-five years ago, and so he has been branded guilty of "terrorist activity." Those were terrible days which saw, among other horrors, rioting, the burning of vehicles, the demolition of buildings, and the harassment of Catholic children playing and walking to school. It was a time of violent political conflict. But that was then. No one now suggests that Malachy poses a threat to anyone, much less to our national security, but this is a fact that Congress does not permit us to consider.

Additionally, I cannot help but observe that Malachy's acts, and the ensuing conviction on which the findings of removability and ineligibility for asylum or any other relief was based, bear no relation to any common-sense understanding of

what "terrorist activity" really is or should be. Because, however, Congress has defined "terrorist activity" and "engage in terrorist activity" so broadly, it is game, set, and match. Lest anyone question how broad those definitions are, I offer this: to assist a suicide by knowingly providing the weapon used would be to "engage in terrorist activity," as would swinging a baseball bat at someone during a bar-room brawl, as would teenage gang members planning to go after a rival gang and use their knives if necessary.

Worse yet, we are prohibited from considering not only the man Malachy is today, but the circumstances surrounding his commission of those acts twenty-five years ago invoked now to deny him relief – the eight hundred years of history that led Malachy to fight with his people to remove British rule, and the persecution inflicted by that rule on Northern Ireland and on Malachy and his family. "The Troubles," the Immigration Judge found, touched each of the McAllisters' lives. In what ways, and how deeply? Again, we cannot inquire.

It simply should not be that, particularly in circumstances such as those we now have before us, the individual and his individuality are largely, if not entirely, irrelevant, lost in a sea of dispositive definitions and harsh and complex laws. And we cannot be the country we should be if, because of the tragic events of September 11th, we knee-jerk remove decent men and women merely because they may have erred at one point in their lives. We should look a little closer; we should care a little more. I would ask – no, I would implore – the Attorney General to exercise his discretion and permit this deserving family to stay.

-24-